## STEWARD MACHINE CO. *v.* DAVIS, COLLECTOR OF INTERNAL REVENUE.

No. 837. Argued April 8, 9, 1937.—Decided May 24, 1937.

*Mr. William Logan Martin* opened for the petitioner and *Mr. Niel P. Sterne* closed. *Messrs. Borden Burr* and *Walter Bouldin* were on the brief with *Mr. Martin.** Summary from the brief:

---

* Report of oral arguments may be found in Senate Doc. No. 53, 75th Cong. 1st Sess., p. 61 *et seq.*

552

Mr. *Charles E. Wyzanski, Jr.,* and *Assistant Attorney General Jackson,* with whom *Attorney General Cummings, Solicitor General Reed,* and *Messrs. Sewall Key, A. H. Feller, J. P. Jackson, Arnold Raum, F. A. LeSourd, Thomas H. Eliot,* and *Alanson Willcox* were on the brief, for respondent.

554

558

564

568

570

572

*Messrs. Edward F. McClennen* and *Jacob J. Kaplan* filed a brief as *amici curiae,* challenging the validity of the Act.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The validity of the tax imposed by the Social Security Act on employers of eight or more is here to be determined.

Petitioner, an Alabama corporation, paid a tax in accordance with the statute, filed a claim for refund with the Commissioner of Internal Revenue, and sued to recover the payment ($46.14), asserting a conflict between the statute and the Constitution of the United States. Upon demurrer the District Court gave judgment for the defendant dismissing the complaint, and the Circuit Court of Appeals for the Fifth Circuit affirmed. 89 F. (2d) 207. The decision is in accord with judgments of the Supreme Judicial Court of Massachusetts (*Howes Brothers Co.* v. *Massachusetts Unemployment Compensation Comm'n,* December 30, 1936, 5 N. E. (2d) 720), the Supreme Court of California (*Gillum* v. *Johnson,* 7 Cal. (2d) 744; 62 P. (2d) 1037), and the Supreme Court of Alabama (*Beeland Wholesale Co.* v. *Kaufman,* 174 So. 516). It is in conflict with a judgment of the Circuit Court of Appeals for the First Circuit, from which one judge dissented. *Davis* v. *Boston & Maine R. Co.,* 89 F. (2d) 368. An important question of constitutional law being involved, we granted certiorari.

The Social Security Act (Act of August 14, 1935, c. 531, 49 Stat. 620, 42 U. S. C., c. 7 (Supp.)) is divided into eleven separate titles, of which only Titles IX and III are so related to this case as to stand in need of summary.

The caption of Title IX is " Tax on Employers of Eight or More." Every employer (with stated exceptions) is to pay for each calendar year "an excise tax, with respect to having individuals in his employ," the tax to be measured by prescribed percentages of the total wages payable by the employer during the calendar year with respect to such employment. § 901. One is not, however, an "employer" within the meaning of the act unless he employs eight persons or more. § 907 (a). There are also other limitations of minor importance. The term "employment" too has its special definition, excluding agricultural labor, domestic service in a private home and some other smaller classes. § 907 (c). The tax begins with the year 1936, and is payable for the first time on January 31, 1937. During the calendar year 1936 the rate is to be one per cent, during 1937 two per cent, and three per cent thereafter. The proceeds, when collected, go into the Treasury of the United States like internal-revenue collections generally. § 905 (a). They are not earmarked in any way. In certain circumstances, however, credits are allowable. § 902. If the taxpayer has made contributions to an unemployment fund under a state law, he may credit such contributions against the federal tax, provided, however, that the total credit allowed to any taxpayer shall not exceed 90 per centum of the tax against which it is credited, and provided also that the state law shall have been certified to the Secretary of the Treasury by the Social Security Board as satisfying certain minimum criteria. § 902. The provisions of § 903 defining those criteria are stated in the

margin.[1]  Some of the conditions thus attached to the allowance of a credit are designed to give assurance that the state unemployment compensation law shall be one in substance as well as name.  Others are designed to give assurance that the contributions shall be protected against loss after payment to the state.  To this last end there

[1] Sec. 903. (a) The Social Security Board shall approve any State law submitted to it, within thirty days of such submission, which it finds provides that—

(1) All compensation is to be paid through public employment offices in the State or such other agencies as the Board may approve:

(2) No compensation shall be payable with respect to any day of unemployment occurring within two years after the first day of the first period with respect to which contributions are required;

(3) All money received in the unemployment fund shall immediately upon such receipt be paid over to the Secretary of the Treasury to the credit of the Unemployment Trust Fund established by Section 904;

(4) All money withdrawn from the Unemployment Trust Fund by the State agency shall be used solely in the payment of compensation, exclusive of expenses of administration;

(5) Compensation shall not be denied in such State to any otherwise eligible individual for refusing to accept new work under any of the following conditions: (A) If the position offered is vacant due directly to a strike, lockout, or other labor dispute; (B) if the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality; (C) if as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization;

(6) All the rights, privileges, or immunities conferred by such law or by acts done pursuant thereto shall exist subject to the power of the legislature to amend or repeal such law at any time.

The Board shall, upon approving such law, notify the Governor of the State of its approval.

(b) On December 31 in each taxable year the Board shall certify to the Secretary of the Treasury each State whose law it has previously approved, except that it shall not certify any State which, after reasonable notice and opportunity for hearing to the State

are provisions that before a state law shall have the approval of the Board it must direct that the contributions to the state fund be paid over immediately to the Secretary of the Treasury to the credit of the "Unemployment Trust Fund." Section 904 establishing this fund is quoted below.[2] For the moment it is enough to say that the Fund is to be held by the Secretary of the Treasury, who is to invest in government securities any portion not required in his judgment to meet current withdrawals. He is authorized and directed to pay out of the Fund to any competent state agency such sums as it may duly requisition from the amount standing to its credit. § 904 (f).

agency, the Board finds has changed its law so that it no longer contains the provisions specified in subsection (a) or has with respect to such taxable year failed to comply substantially with any such provision.

(c) If, at any time during the taxable year, the Board has reason to believe that a State whose law it has previously approved, may not be certified under subsection (b), it shall promptly so notify the Governor of such State.

[2] Sec. 904. (a) There is hereby established in the Treasury of the United States a trust fund to be known as the "Unemployment Trust Fund," hereinafter in this title called the "Fund." The Secretary of the Treasury is authorized and directed to receive and hold in the Fund all moneys deposited therein by a State agency from a State unemployment fund. Such deposit may be made directly with the Secretary of the Treasury or with any Federal reserve bank or member bank of the Federal Reserve System designated by him for such purpose.

(b) It shall be the duty of the Secretary of the Treasury to invest such portion of the Fund as is not, in his judgment, required to meet current withdrawals. Such investment may be made only in interest-bearing obligations of the United States or in obligations guaranteed as to both principal and interest by the United States. For such purpose such obligations may be acquired (1) on original issue at par, or (2) by purchase of outstanding obligations at the market price. The purposes for which obligations of the United States may be issued under the Second Liberty Bond Act, as amended, are hereby extended to authorize the issuance at par of special obligations exclusively to the Fund. Such special obligations shall bear interest at a

Title III, which is also challenged as invalid, has the caption "Grants to States for Unemployment Compensation Administration." Under this title, certain sums of money are "authorized to be appropriated" for the purpose of assisting the states in the administration of their unemployment compensation laws, the maximum for the fiscal year ending June 30, 1936 to be $4,000,000, and $49,000,000 for each fiscal year thereafter. § 301. No present appropriation is made to the extent of a single dollar. All that the title does is to authorize future appropriations. Actually only $2,250,000 of the $4,000,000 authorized was appropriated for 1936 (Act of Feb. 11,

rate equal to the average rate of interest, computed as of the end of the calendar month next preceding the date of such issue, borne by all interest-bearing obligations of the United States then forming part of the public debt; except that where such average rate is not a multiple of one-eighth of 1 per centum, the rate of interest of such special obligations shall be the multiple of one-eighth of 1 per centum next lower than such average rate. Obligations other than such special obligations may be acquired for the Fund only on such terms as to provide an investment yield not less than the yield which would be required in the case of special obligations if issued to the Fund upon the date of such acquisition.

(c) Any obligations acquired by the Fund (except special obligations issued exclusively to the Fund) may be sold at the market price, and such special obligations may be redeemed at par plus accrued interest.

(d) The interest on, and the proceeds from the sale or redemption of, any obligations held in the Fund shall be credited to and form a part of the Fund.

(e) The Fund shall be invested as a single fund, but the Secretary of the Treasury shall maintain a separate book account for each State agency and shall credit quarterly on March 31, June 30, September 30, and December 31, of each year, to each account, on the basis of the average daily balance of such account, a proportionate part of the earnings of the Fund for the quarter ending on such date.

(f) The Secretary of the Treasury is authorized and directed to pay out of the Fund to any State agency such amount as it may duly requisition, not exceeding the amount standing to the account of such State agency at the time of such payment.

1936, c. 49, 49 Stat. 1109, 1113) and only $29,000,000 of the $49,000,000 authorized for the following year. Act of June 22, 1936, c. 689, 49 Stat. 1597, 1605. The appropriations when made were not specifically out of the proceeds of the employment tax, but out of any moneys in the Treasury. Other sections of the title prescribe the method by which the payments are to be made to the state (§ 302) and also certain conditions to be established to the satisfaction of the Social Security Board before certifying the propriety of a payment to the Secretary of the Treasury. § 303. They are designed to give assurance to the Federal Government that the moneys granted by it will not be expended for purposes alien to the grant, and will be used in the administration of genuine unemployment compensation laws.

The assault on the statute proceeds on an extended front. Its assailants take the ground that the tax is not an excise; that it is not uniform throughout the United States as excises are required to be; that its exceptions are so many and arbitrary as to violate the Fifth Amendment; that its purpose was not revenue, but an unlawful invasion of the reserved powers of the states; and that the states in submitting to it have yielded to coercion and have abandoned governmental functions which they are not permitted to surrender.

The objections will be considered seriatim with such further explanation as may be necessary to make their meaning clear.

*First.* The tax, which is described in the statute as an excise, is laid with uniformity throughout the United States as a duty, an impost or an excise upon the relation of employment.

■ We are told that the relation of employment is one so essential to the pursuit of happiness that it may not be burdened with a tax. Appeal is made to history. From the precedents of colonial days we are supplied with

illustrations of excises common in the colonies. They are said to have been bound up with the enjoyment of particular commodities. Appeal is also made to principle or the analysis of concepts. An excise, we are told, imports a tax upon a privilege; employment, it is said, is a right, not a privilege, from which it follows that employment is not subject to an excise. Neither the one appeal nor the other leads to the desired goal.

As to the argument from history: Doubtless there were many excises in colonial days and later that were associated, more or less intimately, with the enjoyment or the use of property. This would not prove, even if no others were then known, that the forms then accepted were not subject to enlargement. Cf. *Pensacola Telegraph Co.* v. *Western Union,* 96 U. S. 1, 9; *In re Debs,* 158 U. S. 564, 591; *South Carolina* v. *United States,* 199 U. S. 437, 448, 449. But in truth other excises *were* known, and known since early times. Thus in 1695 (6 & 7 Wm. III, c. 6), Parliament passed an act which granted "to His Majesty certain Rates and Duties upon Marriage, Births and Burials," all for the purpose of "carrying on the War against France with Vigour." See *Opinion of the Justices,* 196 Mass. 603, 609; 85 N. E. 545. No commodity was affected there. The industry of counsel has supplied us with an apter illustration where the tax was not different in substance from the one now challenged as invalid. In 1777, before our Constitutional Convention, Parliament laid upon employers an annual "duty" of 21 shillings for "every male Servant" employed in stated forms of work.[3]

---

[3] The list of services is comprehensive. It included: "Maitre d'Hotel, House-steward, Master of the Horse, Groom of the Chamber, Valet de Chambre, Butler, Under-butler, Clerk of the Kitchen, Confectioner, Cook, House-porter, Footman, Running-footman, Coachman, Groom, Postillion, Stable-boy, and the respective Helpers in the Stables of such Coachman, Groom, or Postillion, or in the Capacity of Gardener (not being a Day-labourer), Park-keeper, Gamekeeper, Huntsman, Whipper-in . . ."

Revenue Act of 1777, 17 George III, c. 39.[4] The point is made as a distinction that a tax upon the use of male servants was thought of as a tax upon a luxury. *Davis* v. *Boston & Maine R. Co., supra.* It did not touch employments in husbandry or business. This is to throw over the argument that historically an excise is a tax upon the enjoyment of commodities. But the attempted distinction, whatever may be thought of its validity, is inapplicable to a statute of Virginia passed in 1780. There a tax of three pounds, six shillings and eight pence was to be paid for every male tithable above the age of twenty-one years (with stated exceptions), and a like tax for "every white servant whatsoever, except apprentices under the age of twenty one years." 10 Hening's Statutes of Virginia, p. 244. Our colonial forbears knew more about ways of taxing than some of their descendants seem to be willing to concede.[5]

The historical prop failing, the prop or fancied prop of principle remains. We learn that employment for lawful gain is a "natural" or "inherent" or "inalienable" right, and not a "privilege" at all. But natural rights, so called, are as much subject to taxation as rights of less importance.[6] An excise is not limited to vocations or activities

---

[4] The statute, amended from time to time, but with its basic structure unaffected, is on the statute books today. Act of 1803, 43 George III, c. 161; Act of 1812, 52 George III, c. 93; Act of 1853, 16 & 17 Vict., c. 90; Act of 1869, 32 & 33 Vict., c. 14. 24 Halsbury's Laws of England, 1st ed., pp. 692 *et seq.*

[5] See also the following laws imposing occupation taxes: 12 Hening's Statutes of Virginia, p. 285, Act of 1786; Chandler, The Colonial Records of Georgia, vol. 19, Part 2, p. 88, Act of 1778; 1 Potter, Taylor and Yancey, North Carolina Revised Laws, p. 501, Act of 1784.

[6] The cases are brought together by Professor John MacArthur Maguire in an essay, "Taxing the Exercise of Natural Rights" (Harvard Legal Essays, 1934, pp. 273, 322).

The Massachusetts decisions must be read in the light of the particular definitions and restrictions of the Massachusetts Constitution.

that may be prohibited altogether. It is not limited to those that are the outcome of a franchise. It extends to vocations or activities pursued as of common right. What the individual does in the operation of a business is amenable to taxation just as much as what he owns, at all events if the classification is not tyrannical or arbitrary. "Business is as legitimate an object of the taxing powers as property." *Newton* v. *Atchison,* 31 Kan. 151, 154 (per Brewer, J.); 1 Pac. 288. Indeed, ownership itself, as we had occasion to point out the other day, is only a bundle of rights and privileges invested with a single name. *Henneford* v. *Silas Mason Co.,* 300 U. S. 577. "A state is at liberty, if it pleases, to tax them all collectively, or to separate the faggots and lay the charge distributively." *Ibid.* Employment is a business relation, if not itself a business. It is a relation without which business could seldom be carried on effectively. The power to tax the activities and relations that constitute a calling considered as a unit is the power to tax any of them. The whole includes the parts. *Nashville, C. & St. L. Ry. Co.* v. *Wallace,* 288 U. S. 249, 267, 268.

The subject matter of taxation open to the power of the Congress is as comprehensive as that open to the power of the states, though the method of apportionment may at times be different. "The Congress shall have power to lay and collect taxes, duties, imposts and excises." Art. 1, § 8. If the tax is a direct one, it shall be apportioned according to the census or enumeration. If it is a duty, impost, or excise, it shall be uniform throughout the United States. Together, these classes include every form of tax appropriate to sovereignty. Cf. *Burnet* v. *Brooks,* 288 U. S. 378, 403, 405; *Brushaber* v. *Union Pacific R. Co.,* 240 U. S. 1, 12. Whether the tax is to be

*Opinion of the Justices,* 282 Mass. 619, 622; 186 N. E. 490; 266 Mass. 590, 593; 165 N. E. 904. And see *Howes Brothers Co.* v. *Massachusetts Unemployment Compensation Comm'n, supra,* pp. 730, 731.

classified as an "excise" is in truth not of critical importance. If not that, it is an "impost" (*Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601, 622, 625; *Pacific Insurance Co.* v. *Soule*, 7 Wall. 433, 445), or a "duty" (*Veazie Bank* v. *Fenno*, 8 Wall. 533, 546, 547; *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 570; *Knowlton* v. *Moore*, 178 U. S. 41, 46). A capitation or other "direct" tax it certainly is not. "Although there have been from time to time intimations that there might be some tax which was not a direct tax nor included under the words 'duties, imposts and excises,' such a tax for more than one hundred years of national existence has as yet remained undiscovered, notwithstanding the stress of particular circumstances has invited thorough investigation into sources of powers." *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 557. There is no departure from that thought in later cases, but rather a new emphasis of it. Thus, in *Thomas* v. *United States*, 192 U. S. 363, 370, it was said of the words "duties, imposts and excises" that "they were used comprehensively to cover customs and excise duties imposed on importation, consumption, manufacture and sale of certain commodities, privileges, particular business transactions, vocations, occupations and the like." At times taxpayers have contended that the Congress is without power to lay an excise on the enjoyment of a privilege created by state law. The contention has been put aside as baseless. Congress may tax the transmission of property by inheritance or will, though the states and not Congress have created the privilege of succession. *Knowlton* v. *Moore, supra,* p. 58. Congress may tax the enjoyment of a corporate franchise, though a state and not Congress has brought the franchise into being. *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 155. The statute books of the states are strewn with illustrations of taxes laid on

occupations pursued of common right.[7]  We find no basis for a holding that the power in that regard which belongs by accepted practice to the legislatures of the states, has been denied by the Constitution to the Congress of the nation.

■ The tax being an excise, its imposition must conform to the canon of uniformity.  There has been no departure from this requirement.  According to the settled doctrine the uniformity exacted is geographical, not intrinsic.  *Knowlton* v. *Moore, supra,* p. 83; *Flint* v. *Stone Tracy Co., supra,* p. 158; *Billings* v. *United States,* 232 U. S. 261, 282; *Stellwagen* v. *Clum,* 245 U. S. 605, 613; *LaBelle Iron Works* v. *United States,* 256 U. S. 377, 392; *Poe* v. *Seaborn,* 282 U. S. 101, 117; *Wright* v. *Vinton Branch Mountain Trust Bank,* 300 U. S. 440.  "The rule of liability shall be the same in all parts of the United States."  *Florida* v. *Mellon,* 273 U. S. 12, 17.

*Second.*  The excise is not invalid under the provisions of the Fifth Amendment by force of its exemptions.

---

[7] Alabama General Acts, 1935, c. 194, Art. XIII (flat license tax on occupations); Arizona Revised Code, Supplement (1936) § 3138a *et seq.* (general gross receipts tax); Connecticut General Statutes, Supplement (1935) §§ 457c, 458c (gross receipts tax on unincorporated businesses); Revised Code of Delaware (1935) §§ 192–197 (flat license tax on occupations); Compiled Laws of Florida, Permanent Supplement (1936) Vol. I, § 1279 (flat license tax on occupations); Georgia Laws, 1935, p. 11 (flat license tax on occupations); Indiana Statutes Ann. (1933) § 64–2601 *et seq.* (general gross receipts tax); Louisiana Laws, 3rd Extra Session, 1934, Act No. 15, 1st Extra Session, 1935, Acts Nos. 5, 6 (general gross receipts tax); Mississippi Laws, 1934, c. 119 (general gross receipts tax); New Mexico Laws, 1935, c. 73 (general gross receipts tax); South Dakota Laws, 1933, c. 184 (general gross receipts tax, expired June 30, 1935); Washington Laws, 1935, c. 180, Title II (general gross receipts tax); West Virginia Code, Supplement (1935) § 960 (general gross receipts tax).

The statute does not apply, as we have seen, to employers of less than eight. It does not apply to agricultural labor, or domestic service in a private home or to some other classes of less importance. Petitioner contends that the effect of these restrictions is an arbitrary discrimination vitiating the tax.

The Fifth Amendment unlike the Fourteenth has no equal protection clause. *LaBelle Iron Works* v. *United States, supra; Brushaber* v. *Union Pacific R. Co., supra,* p. 24. But even the states, though subject to such a clause, are not confined to a formula of rigid uniformity in framing measures of taxation. *Swiss Oil Corp.* v. *Shanks,* 273 U. S. 407, 413. They may tax some kinds of property at one rate, and others at another, and exempt others altogether. *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232; *Stebbins* v. *Riley,* 268 U. S. 137, 142; *Ohio Oil Co.* v. *Conway,* 281 U. S. 146, 150. They may lay an excise on the operations of a particular kind of business, and exempt some other kind of business closely akin thereto. *Quong Wing* v. *Kirkendall,* 223 U. S. 59, 62; *American Sugar Refining Co.* v. *Louisiana,* 179 U. S. 89, 94; *Armour Packing Co.* v. *Lacy,* 200 U. S. 226, 235; *Brown-Forman Co.* v. *Kentucky,* 217 U. S. 563, 573; *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245, 255; *State Board of Tax Comm'rs* v. *Jackson,* 283 U. S. 527, 537, 538. If this latitude of judgment is lawful for the states, it is lawful, *a fortiori,* in legislation by the Congress, which is subject to restraints less narrow and confining. *Quong Wing* v. *Kirkendall, supra.*

The classifications and exemptions directed by the statute now in controversy have support in considerations of policy and practical convenience that cannot be condemned as arbitrary. The classifications and exemptions would therefore be upheld if they had been adopted by a state and the provisions of the Fourteenth Amendment were invoked to annul them. This is held in two cases

passed upon today in which precisely the same provisions were the subject of attack, the provisions being contained in the Unemployment Compensation Law of the State of Alabama. *Carmichael* v. *Southern Coal & Coke Co.,* and *Carmichael* v. *Gulf States Paper Corp., ante,* p. 495. The opinion rendered in those cases covers the ground fully. It would be useless to repeat the argument. The act of Congress is therefore valid, so far at least as its system of exemptions is concerned, and this though we assume that discrimination, if gross enough, is equivalent to confiscation and subject under the Fifth Amendment to challenge and annulment.

*Third.* The excise is not void as involving the coercion of the States in contravention of the Tenth Amendment or of restrictions implicit in our federal form of government.

The proceeds of the excise when collected are paid into the Treasury at Washington, and thereafter are subject to appropriation like public moneys generally. *Cincinnati Soap Co.* v. *United States, ante,* p. 308. No presumption can be indulged that they will be misapplied or wasted.[8] Even if they were collected in the hope or expectation that some other and collateral good would be furthered as an incident, that without more would not make the act invalid. *Sonzinsky* v. *United States,* 300 U. S. 506. This indeed is hardly questioned. The case for the petitioner is built on the contention that here an ulterior aim is wrought into the very structure of the act, and what is

---

[8] The total estimated receipts without taking into account the 90 per cent deduction, range from $225,000,000 in the first year to over $900,000,000 seven years later. Even if the maximum credits are available to taxpayers in all states, the maximum estimated receipts from Title IX will range between $22,000,000, at one extreme, to $90,000,000 at the other. If some of the states hold out in their unwillingness to pass statutes of their own, the receipts will be still larger.

even more important that the aim is not only ulterior, but essentially unlawful. In particular, the 90 per cent credit is relied upon as supporting that conclusion. But before the statute succumbs to an assault upon these lines, two propositions must be made out by the assailant. *Cincinnati Soap Co. v. United States, supra.* There must be a showing in the first place that separated from the credit the revenue provisions are incapable of standing by themselves. There must be a showing in the second place that the tax and the credit in combination are weapons of coercion, destroying or impairing the autonomy of the states. The truth of each proposition being essential to the success of the assault, we pass for convenience to a consideration of the second, without pausing to inquire whether there has been a demonstration of the first.

To draw the line intelligently between duress and inducement there is need to remind ourselves of facts as to the problem of unemployment that are now matters of common knowledge. *West Coast Hotel Co. v. Parrish,* 300 U. S. 379. The relevant statistics are gathered in the brief of counsel for the Government. Of the many available figures a few only will be mentioned. During the years 1929 to 1936, when the country was passing through a cyclical depression, the number of the unemployed mounted to unprecedented heights. Often the average was more than 10 million; at times a peak was attained of 16 million or more. Disaster to the breadwinner meant disaster to dependents. Accordingly the roll of the unemployed, itself formidable enough, was only a partial roll of the destitute or needy. The fact developed quickly that the states were unable to give the requisite relief. The problem had become national in area and dimensions. There was need of help from the nation if the people were not to starve. It is too late today for the argument to be heard with tolerance that in a crisis so extreme the use of the moneys of the nation to relieve the unemployed

and their dependents is a use for any purpose narrower than the promotion of the general welfare. Cf. *United States* v. *Butler,* 297 U. S. 1, 65, 66, *Helvering* v. *Davis,* decided herewith, *post,* p. 619. The nation responded to the call of the distressed. Between January 1, 1933 and July 1, 1936, the states (according to statistics submitted by the Government) incurred obligations of $689,291,802 for emergency relief; local subdivisions an additional $775,675,366. In the same period the obligations for emergency relief incurred by the national government were $2,929,307,125, or twice the obligations of states and local agencies combined. According to the President's budget message for the fiscal year 1938, the national government expended for public works and unemployment relief for the three fiscal years 1934, 1935, and 1936, the stupendous total of $8,681,000,000. The *parens patriae* has many reasons—fiscal and economic as well as social and moral—for planning to mitigate disasters that bring these burdens in their train.

In the presence of this urgent need for some remedial expedient, the question is to be answered whether the expedient adopted has overlept the bounds of power. The assailants of the statute say that its dominant end and aim is to drive the state legislatures under the whip of economic pressure into the enactment of unemployment compensation laws at the bidding of the central government. Supporters of the statute say that its operation is not constraint, but the creation of a larger freedom, the states and the nation joining in a coöperative endeavor to avert a common evil. Before Congress acted, unemployment compensation insurance was still, for the most part, a project and no more. Wisconsin was the pioneer. Her statute was adopted in 1931. At times bills for such insurance were introduced elsewhere, but they did not reach the stage of law. In 1935, four states (California, Massachusetts, New Hampshire and New York) passed unem-

ployment laws on the eve of the adoption of the Social Security Act, and two others did likewise after the federal act and later in the year. The statutes differed to some extent in type, but were directed to a common end. In 1936, twenty-eight other states fell in line, and eight more the present year. But if states had been holding back before the passage of the federal law, inaction was not owing, for the most part, to the lack of sympathetic interest. Many held back through alarm lest, in laying such a toll upon their industries, they would place themselves in a position of economic disadvantage as compared with neighbors or competitors. See House Report, No. 615, 74th Congress, 1st session, p. 8; Senate Report, No. 628, 74th Congress, 1st session, p. 11.[9] Two consequences ensued. One was that the freedom of a state to contribute its fair share to the solution of a national problem was paralyzed by fear. The other was that in so far as there was failure by the states to contribute relief according to the measure of their capacity, a disproportionate burden, and a mountainous one, was laid upon the resources of the Government of the nation.

The Social Security Act is an attempt to find a method by which all these public agencies may work together to a common end. Every dollar of the new taxes will continue in all likelihood to be used and needed by the

---

[9] The attitude of Massachusetts is significant. Her act became a law August 12, 1935, two days before the federal act. Even so, she prescribed that its provisions should not become operative unless the federal bill became a law, or unless eleven of the following states (Alabama, Connecticut, Delaware, Georgia, Illinois, Indiana, Iowa, Maine, Maryland, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, North Carolina, Ohio, Rhode Island, South Carolina, Tennessee, Vermont) should impose on their employers burdens substantially equivalent. Acts of 1935, c. 479, p. 655. Her fear of competition is thus forcefully attested. See also California Laws, 1935, c. 352, Art. I, § 2; Idaho Laws, 1936 (Third Extra Session) c. 12, § 26; Mississippi Laws, 1936, c. 176, § 2-a.

nation as long as states are unwilling, whether through timidity or for other motives, to do what can be done at home. At least the inference is permissible that Congress so believed, though retaining undiminished freedom to spend the money as it pleased. On the other hand fulfilment of the home duty will be lightened and encouraged by crediting the taxpayer upon his account with the Treasury of the nation to the extent that his contributions under the laws of the locality have simplified or diminished the problem of relief and the probable demand upon the resources of the fisc. Duplicated taxes, or burdens that approach them, are recognized hardships that government, state or national, may properly avoid. *Henneford* v. *Silas Mason Co., supra; Kidd* v. *Alabama,* 188 U. S. 730, 732; *Watson* v. *State Comptroller,* 254 U. S. 122, 125. If Congress believed that the general welfare would better be promoted by relief through local units than by the system then in vogue, the coöperating localities ought not in all fairness to pay a second time.

Who then is coerced through the operation of this statute? Not the taxpayer. He pays in fulfilment of the mandate of the local legislature. Not the state. Even now she does not offer a suggestion that in passing the unemployment law she was affected by duress. See *Carmichael* v. *Southern Coal & Coke Co.,* and *Carmichael* v. *Gulf States Paper Corp., supra.* For all that appears she is satisfied with her choice, and would be sorely disappointed if it were now to be annulled. The difficulty with the petitioner's contention is that it confuses motive with coercion. "Every tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed." *Sonzinsky* v. *United States, supra.* In like manner every rebate from a tax when conditioned upon conduct is in some measure a temptation. But to hold that motive

or temptation is equivalent to coercion is to plunge the law in endless difficulties. The outcome of such a doctrine is the acceptance of a philosophical determinism by which choice becomes impossible. Till now the law has been guided by a robust common sense which assumes the freedom of the will as a working hypothesis in the solution of its problems. The wisdom of the hypothesis has illustration in this case. Nothing in the case suggests the exertion of a power akin to undue influence, if we assume that such a concept can ever be applied with fitness to the relations between state and nation. Even on that assumption the location of the point at which pressure turns into compulsion, and ceases to be inducement, would be a question of degree,—at times, perhaps, of fact. The point had not been reached when Alabama made her choice. We cannot say that she was acting, not of her unfettered will, but under the strain of a persuasion equivalent to undue influence, when she chose to have relief administered under laws of her own making, by agents of her own selection, instead of under federal laws, administered by federal officers, with all the ensuing evils, at least to many minds, of federal patronage and power. There would be a strange irony, indeed, if her choice were now to be annulled on the basis of an assumed duress in the enactment of a statute which her courts have accepted as a true expression of her will. *Beeland Wholesale Co.* v. *Kaufman, supra.* We think the choice must stand.

In ruling as we do, we leave many questions open. We do not say that a tax is valid, when imposed by act of Congress, if it is laid upon the condition that a state may escape its operation through the adoption of a statute unrelated in subject matter to activities fairly within the scope of national policy and power. No such question is before us. In the tender of this credit Congress does not intrude upon fields foreign to its function. The purpose

of its intervention, as we have shown, is to safeguard its own treasury and as an incident to that protection to place the states upon a footing of equal opportunity. Drains upon its own resources are to be checked; obstructions to the freedom of the states are to be leveled. It is one thing to impose a tax dependent upon the conduct of the taxpayers, or of the state in which they live, where the conduct to be stimulated or discouraged is unrelated to the fiscal need subserved by the tax in its normal operation, or to any other end legitimately national. The *Child Labor Tax Case,* 259 U. S. 20, and *Hill* v. *Wallace,* 259 U. S. 44, were decided in the belief that the statutes there condemned were exposed to that reproach. Cf. *United States* v. *Constantine,* 296 U. S. 287. It is quite another thing to say that a tax will be abated upon the doing of an act that will satisfy the fiscal need, the tax and the alternative being approximate equivalents. In such circumstances, if in no others, inducement or persuasion does not go beyond the bounds of power. We do not fix the outermost line. Enough for present purposes that wherever the line may be, this statute is within it. Definition more precise must abide the wisdom of the future.

*Florida* v. *Mellon,* 273 U. S. 12, supplies us with a precedent, if precedent be needed. What was in controversy there was § 301 of the Revenue Act of 1926, which imposes a tax upon the transfer of a decedent's estate, while at the same time permitting a credit, not exceeding 80 per cent, for "the amount of any estate, inheritance, legacy, or succession taxes actually paid to any State or Territory." Florida challenged that provision as unlawful. Florida had no inheritance taxes and alleged that under its constitution it could not levy any. 273 U. S. 12, 15. Indeed, by abolishing inheritance taxes, it had hoped to induce wealthy persons to become its citizens. See 67 Cong. Rec., Part 1, pp. 735, 752. It argued at our bar that "the Estate Tax provision was not passed for the purpose

of raising federal revenue" (273 U. S. 12, 14), but rather "to coerce States into adopting estate or inheritance tax laws." 273 U. S. 12, 13. In fact, as a result of the 80 per cent credit, material changes of such laws were made in 36 states.[10] In the face of that attack we upheld the act as valid. Cf. *Massachusetts* v. *Mellon*, 262 U. S. 447, 482; also Act of August 5, 1861, c. 45, 12 Stat. 292; Act of May 13, 1862, c. 66, 12 Stat. 384.

*United States* v. *Butler, supra,* is cited by petitioner as a decision to the contrary. There a tax was imposed on processors of farm products, the proceeds to be paid to farmers who would reduce their acreage and crops under agreements with the Secretary of Agriculture, the plan of the act being to increase the prices of certain farm products by decreasing the quantities produced. The court held (1) that the so-called tax was not a true one (pp. 56, 61), the proceeds being earmarked for the benefit of farmers complying with the prescribed conditions, (2) that there was an attempt to regulate production without the consent of the state in which production was affected, and (3) that the payments to farmers were coupled with coercive contracts (p. 73), unlawful in their aim and oppressive in their consequences. The decision was by a divided court, a minority taking the view that the objections were untenable. None of them is applicable to the situation here developed.

(a) The proceeds of the tax in controversy are not earmarked for a special group.

(b) The unemployment compensation law which is a condition of the credit has had the approval of the state and could not be a law without it.

(c) The condition is not linked to an irrevocable agreement, for the state at its pleasure may repeal its unemployment law, § 903 (a) (6), terminate the credit,

---

[10] Perkins, State action under the Federal Estate Tax Credit Clause, 13 North Carolina L. Rev. 271, 280.

and place itself where it was before the credit was accepted.

(d) The condition is not directed to the attainment of an unlawful end, but to an end, the relief of unemployment, for which nation and state may lawfully coöperate.

*Fourth.* The statute does not call for a surrender by the states of powers essential to their quasi-sovereign existence.

Argument to the contrary has its source in two sections of the act. One section (903 [11]) defines the minimum criteria to which a state compensation system is required to conform if it is to be accepted by the Board as the basis for a credit. The other section (904 [12]) rounds out the requirement with complementary rights and duties. Not all the criteria or their incidents are challenged as unlawful. We will speak of them first generally, and then more specifically in so far as they are questioned.

A credit to taxpayers for payments made to a State under a state unemployment law will be manifestly futile in the absence of some assurance that the law leading to the credit is in truth what it professes to be. An unemployment law framed in such a way that the unemployed who look to it will be deprived of reasonable protection is one in name and nothing more. What is basic and essential may be assured by suitable conditions. The terms embodied in these sections are directed to that end. A wide range of judgment is given to the several states as to the particular type of statute to be spread upon their books. For anything to the contrary in the provisions of this act they may use the pooled unemployment form, which is in effect with variations in Alabama, California, Michigan, New York, and elsewhere. They may establish a system of merit ratings applicable at

[11] See note 1, *supra.*
[12] See note 2, *supra.*

once or to go into effect later on the basis of subsequent experience. Cf. §§ 909, 910. They may provide for employee contributions as in Alabama and California, or put the entire burden upon the employer as in New York. They may choose a system of unemployment reserve accounts by which an employer is permitted after his reserve has accumulated to contribute at a reduced rate or even not at all. This is the system which had its origin in Wisconsin. What they may not do, if they would earn the credit, is to depart from those standards which in the judgment of Congress are to be ranked as fundamental. Even if opinion may differ as to the fundamental quality of one or more of the conditions, the difference will not avail to vitiate the statute. In determining essentials Congress must have the benefit of a fair margin of discretion. One cannot say with reason that this margin has been exceeded, or that the basic standards have been determined in any arbitrary fashion. In the event that some particular condition shall be found to be too uncertain to be capable of enforcement, it may be severed from the others, and what is left will still be valid.

We are to keep in mind steadily that the conditions to be approved by the Board as the basis for a credit are not provisions of a contract, but terms of a statute, which may be altered or repealed. § 903 (a) (6). The state does not bind itself to keep the law in force. It does not even bind itself that the moneys paid into the federal fund will be kept there indefinitely or for any stated time. On the contrary, the Secretary of the Treasury will honor a requisition for the whole or any part of the deposit in the fund whenever one is made by the appropriate officials. The only consequence of the repeal or excessive amendment of the statute, or the expenditure of the money, when requisitioned, for other than compensation uses or administrative expenses, is

that approval of the law will end, and with it the allowance of a credit, upon notice to the state agency and an opportunity for hearing. § 903 (b) (c).

These basic considerations are in truth a solvent of the problem. Subjected to their test, the several objections on the score of abdication are found to be unreal.

Thus, the argument is made that by force of an agreement the moneys when withdrawn must be "paid through public employment offices in the State or through such other agencies as the Board may approve." § 903 (a) (1). But in truth there is no agreement as to the method of disbursement. There is only a condition which the state is free at pleasure to disregard or to fulfill. Moreover, approval is not requisite if public employment offices are made the disbursing instruments. Approval is to be a check upon resort to "other agencies" that may, perchance, be irresponsible. A state looking for a credit must give assurance that her system has been organized upon a base of rationality.

There is argument again that the moneys when withdrawn are to be devoted to specific uses, the relief of unemployment, and that by agreement for such payment the quasi-sovereign position of the state has been impaired, if not abandoned. But again there is confusion between promise and condition. Alabama is still free, without breach of an agreement, to change her system over night. No officer or agency of the national Government can force a compensation law upon her or keep it in existence. No officer or agency of that Government, either by suit or other means, can supervise or control the application of the payments.

Finally and chiefly, abdication is supposed to follow from § 904 of the statute and the parts of § 903 that are complementary thereto. § 903 (a) (3). By these the Secretary of the Treasury is authorized and directed to receive and hold in the Unemployment Trust Fund all

moneys deposited therein by a state agency for a state unemployment fund and to invest in obligations of the United States such portion of the Fund as is not in his judgment required to meet current withdrawals. We are told that Alabama in consenting to that deposit has renounced the plenitude of power inherent in her statehood.

The same pervasive misconception is in evidence again. All that the state has done is to say in effect through the enactment of a statute that her agents shall be authorized to deposit the unemployment tax receipts in the Treasury at Washington. Alabama Unemployment Act of September 14, 1935, § 10 (i). The statute may be repealed. § 903 (a) (6). The consent may be revoked. The deposits may be withdrawn. The moment the state commission gives notice to the depositary that it would like the moneys back, the Treasurer will return them. To find state destruction there is to find it almost anywhere. With nearly as much reason one might say that a state abdicates its functions when it places the state moneys on deposit in a national bank.

There are very good reasons of fiscal and governmental policy why a State should be willing to make the Secretary of the Treasury the custodian of the fund. His possession of the moneys and his control of investments will be an assurance of stability and safety in times of stress and strain. A report of the Ways and Means Committee of the House of Representatives, quoted in the margin, develops the situation clearly.[13] Nor is there risk of loss

---

[13] "This last provision will not only afford maximum safety for these funds but is very essential to insure that they will operate to promote the stability of business rather than the reverse. Unemployment reserve funds have the peculiarity that the demands upon them fluctuate considerably, being heaviest when business slackens. If, in such times, the securities in which these funds are invested are thrown upon the market for liquidation, the net effect is likely to be increased deflation. Such a result is avoided in this bill through the provision that all reserve funds are to be held by the United States Treasury, to

or waste. The credit of the Treasury is at all times back of the deposit, with the result that the right of withdrawal will be unaffected by the fate of any intermediate investments, just as if a checking account in the usual form had been opened in a bank.

The inference of abdication thus dissolves in thinnest air when the deposit is conceived of as dependent upon a statutory consent, and not upon a contract effective to create a duty. By this we do not intimate that the conclusion would be different if a contract were discovered. Even sovereigns may contract without derogating from their sovereignty. *Perry* v. *United States,* 294 U. S. 330, 353; 1 Oppenheim, International Law, 4th ed., §§ 493, 494; Hall, International Law, 8th ed., § 107; 2 Hyde, International Law, § 489. The states are at liberty, upon obtaining the consent of Congress, to make agreements with one another. Constitution, Art. I, § 10, par. 3. *Poole* v. *Fleeger,* 11 Pet. 185, 209; *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 725. We find no room for doubt that they may do the like with Congress if the essence of their statehood is maintained without impairment.[14] Alabama

be invested and liquidated by the Secretary of the Treasury in a manner calculated to promote business stability. When business conditions are such that investment in securities purchased on the open market is unwise, the Secretary of the Treasury may issue special nonnegotiable obligations exclusively to the unemployment trust fund. When a reverse situation exists and heavy drains are made upon the fund for payment of unemployment benefits, the Treasury does not have to dispose of the securities belonging to the fund in open market but may assume them itself. With such a method of handling the reserve funds, it is believed that this bill will solve the problem often raised in discussions of unemployment compensation, regarding the possibility of transferring purchasing power from boom periods to depression periods. It will in fact operate to sustain purchasing power at the onset of a depression without having any counteracting deflationary tendencies." House Report, No. 615, 74th Congress, 1st session, p. 9.

[14] Cf. 12 Stat. 503; 26 Stat. 417.

is seeking and obtaining a credit of many millions in favor of her citizens out of the Treasury of the nation. Nowhere in our scheme of government—in the limitations express or implied of our federal constitution—do we find that she is prohibited from assenting to conditions that will assure a fair and just requital for benefits received. But we will not labor the point further. An unreal prohibition directed to an unreal agreement will not vitiate an act of Congress, and cause it to collapse in ruin.

*Fifth.* Title III of the act is separable from Title IX, and its validity is not at issue.

The essential provisions of that title have been stated in the opinion. As already pointed out, the title does not appropriate a dollar of the public moneys. It does no more than authorize appropriations to be made in the future for the purpose of assisting states in the administration of their laws, if Congress shall decide that appropriations are desirable. The title might be expunged, and Title IX would stand intact. Without a severability clause we should still be led to that conclusion. The presence of such a clause (§ 1103) makes the conclusion even clearer. *Williams* v. *Standard Oil Co.,* 278 U. S. 235, 242; *Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165, 184; *Carter* v. *Carter Coal Co.,* 298 U. S. 238, 312.

The judgment is

*Affirmed.*

Separate opinion of Mr. Justice McReynolds.

That portion of the Social Security legislation here under consideration, I think, exceeds the power granted to Congress. It unduly interferes with the orderly government of the State by her own people and otherwise offends the Federal Constitution.

In *Texas* v. *White,* 7 Wall. 700, 725 (1869), a cause of momentous importance, this Court, through Chief Justice Chase, declared—

"But the perpetuity and indissolubility of the Union, by no means implies the loss of distinct and individual existence, or of the right of self-government, by the States. Under the Articles of Confederation each State retained its sovereignty, freedom, and independence, and every power, jurisdiction, and right not expressly delegated to the United States. Under the Constitution, though the powers of the States were much restricted, still, all powers not delegated to the United States, nor prohibited to the States, are reserved to the States respectively, or to the people. And we have already had occasion to remark at this term, that 'the people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence,' and that 'without the States in union, there could be no such political body as the United States.' [*Lane County v. Oregon*, 7 Wall. 71, 76.] Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."

The doctrine thus announced and often repeated, I had supposed was firmly established. Apparently the States remained really free to exercise governmental powers, not delegated or prohibited, without interference by the Federal Government through threats of punitive measures or offers of seductive favors. Unfortunately, the decision just announced opens the way for practical annihilation of this theory; and no cloud of words or ostentatious parade of irrelevant statistics should be permitted to obscure that fact.

The invalidity, also the destructive tendency, of legislation like the Act before us were forcefully pointed out by President Franklin Pierce in a veto message sent to the Senate May 3, 1854.[1] He was a scholarly lawyer of distinction and enjoyed the advice and counsel of a rarely able Attorney General—Caleb Cushing of Massachusetts. This message considers with unusual lucidity points here specially important. I venture to set out pertinent portions of it which must appeal to all who continue to respect both the letter and spirit of our great charter.

*"To the Senate of the United States:*

"The bill entitled 'An Act making a grant of public lands to the several States for the benefit of indigent insane persons,' which was presented to me on the 27th ultimo, has been maturely considered, and is returned to the Senate, the House in which it originated, with a statement of the objections which have required me to withhold from it my approval.

.      .      .      .      .

"If in presenting my objections to this bill I should say more than strictly belongs to the measure or is required for the discharge of my official obligation, let it be attributed to a sincere desire to justify my act before those whose good opinion I so highly value and to that earnestness which springs from my deliberate conviction that a strict adherence to the terms and purposes of the federal compact offers the best, if not the only, security for the preservation of our blessed inheritance of representative liberty.

"The bill provides in substance:

"First. That 10,000,000 acres of land be granted to the several States, to be apportioned among them in the compound ratio of the geographical area and representation of said States in the House of Representatives.

---

[1] "Messages and Papers of the President" by James D. Richardson, Vol. V, pp. 247–256.

"Second. That wherever there are public lands in a State subject to sale at the regular price of private entry, the proportion of said 10,000,000 acres falling to such State shall be selected from such lands within it, and that to the States in which there are no such public lands land scrip shall be issued to the amount of their distributive shares, respectively, said scrip not to be entered by said States, but to be sold by them and subject to entry by their assignees: Provided, That none of it shall be sold at less than $1 per acre, under penalty of forfeiture of the same to the United States.

"Third. That the expenses of the management and superintendence of said lands and of the moneys received therefrom shall be paid by the States to which they may belong out of the treasury of said States.

"Fourth. That the gross proceeds of the sales of such lands or land scrip so granted shall be invested by the several States in safe stocks, to constitute a perpetual fund, the principal of which shall remain forever undiminished, and the interest to be appropriated to the maintenance of the indigent insane within the several States.

"Fifth. That annual returns of lands or scrip sold shall be made by the States to the Secretary of the Interior, and the whole grant be subject to certain conditions and limitations prescribed in the bill, to be assented to by legislative acts of said States.

"This bill therefore proposes that the Federal Government shall make provision to the amount of the value of 10,000,000 acres of land for an eleemosynary object within the several States, to be administered by the political authority of the same; and it presents at the threshold the question whether any such act on the part of the Federal Government is warranted and sanctioned by the Constitution, the provisions and principles of which are to be protected and sustained as a first and paramount duty.

"It can not be questioned that if Congress has power to make provision for the indigent insane without the limits of this District it has the same power to provide for the indigent who are not insane, and thus to transfer to the Federal Government the charge of all the poor in all the States. It has the same power to provide hospitals and other local establishments for the care and cure of every species of human infirmity, and thus to assume all that duty of either public philanthropy or public necessity to the dependent, the orphan, the sick, or the needy which is now discharged by the States themselves or by corporate institutions or private endowments existing under the legislation of the States. The whole field of public beneficence is thrown open to the care and culture of the Federal Government. Generous impulses no longer encounter the limitations and control of our imperious fundamental law; for however worthy may be the present object in itself, it is only one of a class. It is not exclusively worthy of benevolent regard. Whatever considerations dictate sympathy for this particular object apply in like manner, if not in the same degree, to idiocy, to physical disease, to extreme destitution. If Congress may and ought to provide for any one of these objects, it may and ought to provide for them all. And if it be done in this case, what answer shall be given when Congress shall be called upon, as it doubtless will be, to pursue a similar course of legislation in the others? It will obviously be vain to reply that the object is worthy, but that the application has taken a wrong direction. The power will have been deliberately assumed, the general obligation will by this act have been acknowledged, and the question of means and expediency will alone be left for consideration. The decision upon the principle in any one case determines it for the whole class. The question presented, therefore, clearly is upon the constitutionality and propriety of the Federal Gov-

ernment assuming to enter into a novel and vast field of legislation, namely, that of providing for the care and support of all those among the people of the United States who by any form of calamity become fit objects of public philanthropy.

"I readily and, I trust, feelingly acknowledge the duty incumbent on us all as men and citizens, and as among the highest and holiest of our duties, to provide for those who, in the mysterious order of Providence, are subject to want and to disease of body or mind; but I can not find any authority in the Constitution for making the Federal Government the great almoner of public charity throughout the United States. To do so would, in my judgment, be contrary to the letter and spirit of the Constitution and subversive of the whole theory upon which the Union of these States is founded. And if it were admissible to contemplate the exercise of this power for any object whatever, I can not avoid the belief that it would in the end be prejudicial rather than beneficial in the noble offices of charity to have the charge of them transferred from the States to the Federal Government. Are we not too prone to forget that the Federal Union is the creature of the States, not they of the Federal Union? We were the inhabitants of colonies distinct in local government one from the other before the revolution. By that Revolution the colonies each became an independent State. They achieved that independence and secured its recognition by the agency of a consulting body, which, from being an assembly of the ministers of distinct sovereignties instructed to agree to no form of government which did not leave the domestic concerns of each State to itself, was appropriately denominated a Congress. When, having tried the experiment of the Confederation, they resolved to change that for the present Federal Union, and thus to confer on the Federal Government more ample authority, they scrupulously measured such of the

functions of their cherished sovereignty as they chose to delegate to the General Government. With this aim and to this end the fathers of the Republic framed the Constitution, in and by which the independent and sovereign States united themselves for certain specified objects and purposes, and for those only, leaving all powers not therein set forth as conferred on one or another of the three great departments—the legislative, the executive, and the judicial—indubitably with the States. And when the people of the several States had in their State conventions, and thus alone, given effect and force to the Constitution, not content that any doubt should in future arise as to the scope and character of this act, they ingrafted thereon the explicit declaration that 'the powers not delegated to the United States by the Constitution nor prohibited by it to the States are reserved to the States respectively or to the people.'

"Can it be controverted that the great mass of the business of Government—that involved in the social relations, the internal arrangements of the body politic, the mental and moral culture of men, the development of local resources of wealth, the punishment of crimes in general, the preservation of order, the relief of the needy or otherwise unfortunate members of society—did in practice remain with the States; that none of these objects of local concern are by the Constitution expressly or impliedly prohibited to the States, and that none of them are by any express language of the Constitution transferred to the United States? Can it be claimed that any of these functions of local administration and legislation are vested in the Federal Government by any implication? I have never found anything in the Constitution which is susceptible of such a construction. No one of the enumerated powers touches the subject or has even a remote analogy to it. The powers conferred upon the United States have reference to federal relations, or to the means of accom-

plishing or executing things of federal relation. So also of the same character are the powers taken away from the States by enumeration. In either case the powers granted and the powers restricted were so granted or so restricted only where it was requisite for the maintenance of peace and harmony between the States or for the purpose of protecting their common interests and defending their common sovereignty against aggression from abroad or insurrection at home.

"I shall not discuss at length the question of power sometimes claimed for the General Government under the clause of the eighth section of the Constitution, which gives Congress the power 'to lay and collect taxes, duties, imposts, and excises, to pay debts and provide for the common defense and general welfare of the United States,' because if it has not already been settled upon sound reason and authority it never will be. I take the received and just construction of that article, as if written to lay and collect taxes, duties, imposts, and excises *in order* to pay the debts and *in order* to provide for the common defense and general welfare. It is not a substantive general power to provide for the welfare of the United States, but is a limitation on the grant of power to raise money by taxes, duties, and imposts. If it were otherwise, all the rest of the Constitution, consisting of carefully enumerated and cautiously guarded grants of specific powers, would have been useless, if not delusive. It would be impossible in that view to escape from the conclusion that these were inserted only to mislead for the present, and, instead of enlightening and defining the pathway of the future, to involve its action in the mazes of doubtful construction. Such a conclusion the character of the men who framed that sacred instrument will never permit us to form. Indeed, to suppose it susceptible of any other construction would be to consign all the rights of the States and of the people of the States to the mere discre-

tion of Congress, and thus to clothe the Federal Government with authority to control the sovereign States, by which they would have been dwarfed into provinces or departments and all sovereignty vested in an absolute consolidated central power, against which the spirit of liberty has so often and in so many countries struggled in vain.

"In my judgment you can not by tributes to humanity make any adequate compensation for the wrong you would inflict by removing the sources of power and political action from those who are to be thereby affected. If the time shall ever arrive when, for an object appealing, however strongly, to our sympathies, the dignity of the States shall bow to the dictation of Congress by conforming their legislation thereto, when the power and majesty and honor of those who created shall become subordinate to the thing of their creation, I but feebly utter my apprehensions when I express my firm conviction that we shall see 'the beginning of the end.'

"Fortunately, we are not left in doubt as to the purpose of the Constitution any more than as to its express language, for although the history of its formation, as recorded in the Madison Papers, shows that the Federal Government in its present form emerged from the conflict of opposing influences which have continued to divide statesmen from that day to this, yet the rule of clearly defined powers and of strict construction presided over the actual conclusion and subsequent adoption of the Constitution. President Madison, in the Federalist, says:

" 'The powers delegated by the proposed Constitution are few and defined. Those which are to remain in the State governments are numerous and indefinite. . . . Its [the General Government's] jurisdiction extends to certain enumerated objects only, and leaves to the several States a residuary and inviolable sovereignty over all other objects.'

"In the same spirit President Jefferson invokes 'the support of the State governments in all their rights as the most competent administrations for our domestic concerns and the surest bulwarks against anti-republican tendencies;' and President Jackson said that our true strength and wisdom are not promoted by invasions of the rights and powers of the several States, but that, on the contrary, they consist 'not in binding the States more closely to the center, but in leaving each more unobstructed in its proper orbit.'

"The framers of the Constitution, in refusing to confer on the Federal Government any jurisdiction over these purely local objects, in my judgment manifested a wise forecast and broad comprehension of the true interests of these objects themselves. It is clear that public charities within the States can be efficiently administered only by their authority. The bill before me concedes this, for it does not commit the funds it provides to the administration of any other authority.

"I can not but repeat what I have before expressed, that if the several States, many of which have already laid the foundation of munificent establishments of local beneficence, and nearly all of which are proceeding to establish them, shall be led to suppose, as, should this bill become a law, they will be, that Congress is to make provision for such objects, the fountains of charity will be dried up at home, and the several States, instead of bestowing their own means on the social wants of their own people, may themselves, through the strong temptation which appeals to states as to individuals, become humble suppliants for the bounty of the Federal Government, reversing their true relations to this Union.

. . . . .

"I have been unable to discover any distinction on constitutional grounds or grounds of expediency between an appropriation of $10,000,000 directly from the money in

the Treasury for the object contemplated and the appropriation of lands presented for my sanction, and yet I can not doubt that if the bill proposed $10,000,000 from the Treasury of the United States for the support of the indigent insane in the several States that the constitutional question involved in the act would have attracted forcibly the attention of Congress.

"I respectfully submit that in a constitutional point of view it is wholly immaterial whether the appropriation be in money or in land.

.            .            .            .            .

"To assume that the public lands are applicable to ordinary State objects, whether of public structures, police, charity, or expenses of State administration, would be to disregard to the amount of the value of the public lands all the limitations of the Constitution and confound to that extent all distinctions between the rights and powers of the States and those of the United States; for if the public lands may be applied to the support of the poor, whether sane or insane, if the disposal of them and their proceeds be not subject to the ordinary limitations of the Constitution, then Congress possesses unqualified power to provide for expenditures in the States by means of the public lands, even to the degree of defraying the salaries of governors, judges, and all other expenses of the government and internal administration within the several States.

"The conclusion from the general survey of the whole subject is to my mind irresistible, and closes the question both of right and of expediency so far as regards the principle of the appropriation proposed in this bill. Would not the admission of such power in Congress to dispose of the public domain work the practical abrogation of some of the most important provisions of the Constitution?

.            .            .            .            .

"The general result at which I have arrived is the necessary consequence of those views of the relative rights, powers, and duties of the States and of the Federal Government which I have long entertained and often expressed and in reference to which my convictions do but increase in force with time and experience."

No defense is offered for the legislation under review upon the basis of emergency. The hypothesis is that hereafter it will continuously benefit unemployed members of a class. Forever, so far as we can see, the States are expected to function under federal direction concerning an internal matter. By the sanction of this adventure, the door is open for progressive inauguration of others of like kind under which it can hardly be expected that the States will retain genuine independence of action. And without independent States a Federal Union as contemplated by the Constitution becomes impossible.

At the bar counsel asserted that under the present Act the tax upon residents of Alabama during the first year will total $9,000,000. All would remain in the Federal Treasury but for the adoption by the State of measures agreeable to the National Board. If continued, these will bring relief from the payment of $8,000,000 to the United States.

Ordinarily, I must think, a denial that the challenged action of Congress and what has been done under it amount to coercion and impair freedom of government by the people of the State would be regarded as contrary to practical experience. Unquestionably our federate plan of government confronts an enlarged peril.

Separate opinion of MR. JUSTICE SUTHERLAND.

With most of what is said in the opinion just handed down, I concur. I agree that the payroll tax levied is an excise within the power of Congress; that the devotion of

not more than 90% of it to the credit of employers in states which require the payment of a similar tax under so-called unemployment-tax laws is not an unconstitutional use of the proceeds of the federal tax; that the provision making the adoption by the state of an unemployment law of a specified character a condition precedent to the credit of the tax does not render the law invalid. I agree that the states are not coerced by the federal legislation into adopting unemployment legislation. The provisions of the federal law may operate to induce the state to pass an employment law if it regards such action to be in its interest. But that is not coercion. If the act stopped here, I should accept the conclusion of the court that the legislation is not unconstitutional.

But the question with which I have difficulty is whether the administrative provisions of the act invade the governmental administrative powers of the several states reserved by the Tenth Amendment. A state may enter into contracts; but a state cannot, by contract or statute, surrender the execution, or a share in the execution, of any of its governmental powers either to a sister state or to the federal government, any more than the federal government can surrender the control of any of its governmental powers to a foreign nation. The power to tax is vital and fundamental, and, in the highest degree, governmental in character. Without it, the state could not exist. Fundamental also, and no less important, is the governmental power to expend the moneys realized from taxation, and exclusively to administer the laws in respect of the character of the tax and the methods of laying and collecting it and expending the proceeds.

The people of the United States, by their Constitution, have affirmed a division of internal governmental powers between the federal government and the governments of the several states—committing to the first its powers by express grant and necessary implication; to the latter, or

to the people, by reservation, "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States." The Constitution thus affirms the complete supremacy and independence of the state within the field of its powers. *Carter* v. *Carter Coal Co.,* 298 U. S. 238, 295. The federal government has no more authority to invade that field than the state has to invade the exclusive field of national governmental powers; for, in the oft-repeated words of this court in *Texas* v. *White,* 7 Wall. 700, 725, "the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National Government." The necessity of preserving each from every form of illegitimate intrusion or interference on the part of the other is so imperative as to require this court, when its judicial power is properly invoked, to view with a careful and discriminating eye any legislation challenged as constituting such an intrusion or interference. See *South Carolina* v. *United States,* 199 U. S. 437, 448.

The precise question, therefore, which we are required to answer by an application of these principles is whether the congressional act contemplates a surrender by the state to the federal government, in whole or in part, of any state governmental power to administer its own unemployment law or the state payroll-tax funds which it has collected for the purposes of that law. An affirmative answer to this question, I think, must be made.

I do not, of course, doubt the power of the state to select and utilize a depository for the safekeeping of its funds; but it is quite another thing to agree with the selected depository that the funds shall be withdrawn for certain stipulated purposes, and for no other. Nor do I doubt the authority of the federal government and a state government to coöperate to a common end, pro-

vided each of them is authorized to reach it. But such coöperation must be effectuated by an exercise of the powers which they severally possess, and not by an exercise, through invasion or surrender, by one of them of the governmental power of the other.

An illustration of what I regard as permissible coöperation is to be found in Title I of the act now under consideration. By that title, federal appropriations for old-age assistance are authorized to be made to any state which shall have adopted a plan for old-age assistance conforming to designated requirements. But the state is not obliged, as a condition of having the federal bounty, to deposit in the federal treasury funds raised by the state. The state keeps its own funds and administers its own law in respect of them, without let or hindrance of any kind on the part of the federal government; so that we have simply the familiar case of federal aid upon conditions which the state, without surrendering any of its powers, may accept or not as it chooses. *Massachusetts* v. *Mellon,* 262 U. S. 447, 480, 482–483.

But this is not the situation with which we are called upon to deal in the present case. For here, the state *must* deposit the proceeds of its taxation in the federal treasury, upon terms which make the deposit suspiciously like a forced loan to be repaid only in accordance with restrictions imposed by federal law. Title IX, §§ 903 (a) (3), 904 (a), (b), (e). All moneys withdrawn from this fund must be used exclusively for the payment of compensation. § 903 (a) (4). And this compensation is to be paid through public employment offices in the state or such other agencies as a *federal board may approve.* § 903 (a) (1). The act, it is true, recognizes [§ 903 (a) (6)] the power of the legislature to amend or repeal its compensation law at any time. But there is nothing in the act, as I read it, which justifies the conclusion that the state may, in that event, unconditionally withdraw its

funds from the federal treasury. Section 903 (b) provides that the board shall certify in each taxable year to the Secretary of the Treasury each state whose law has been approved. But the board is forbidden to certify any state which the board finds has so changed its law that it no longer contains the provisions specified in subsection (a), "or has with respect to such taxable year failed to comply substantially with any such provision." The federal government, therefore, in the person of its agent, the board, sits not only as a perpetual overseer, interpreter and censor of state legislation on the subject, but, as lord paramount, to determine whether the state is faithfully executing its own law—as though the state were a dependency under pupilage * and not to be trusted. The foregoing, taken in connection with the provisions that money withdrawn can be used only in payment of compensation and that it must be paid through an agency approved by the federal board, leaves it, to say the least, highly uncertain whether the right of the state to withdraw any part of its own funds exists, under the act, otherwise than upon these various statutory conditions. It is true also that subsection (f) of § 904 authorizes the Secretary of the Treasury to pay to any state agency "such amount as it may duly requisition, not exceeding the amount standing to the account of such State agency at the time of such payment." But it is to be observed that the payment is to be made to the state *agency,* and only such amount as that agency may *duly* requisition. It is hard to find in this provision any extension of the right of the state to withdraw its funds except in the manner and for the specific purpose prescribed by the act.

By these various provisions of the act, the federal agencies are authorized to supervise and hamper the administrative powers of the state to a degree which not only does not comport with the dignity of a quasi-sov-

---

* Compare *Snow* v. *United States,* 18 Wall. 317, 319–320.

ereign state—a matter with which we are not judicially concerned—but which denies to it that supremacy and freedom from external interference in respect of its affairs which the Constitution contemplates—a matter of very definite judicial concern. I refer to some, though by no means all, of the cases in point.

In the *License Cases,* 5 How. 504, 588, Mr. Justice McLean said that the federal government was supreme within the scope of its delegated powers, and the state governments equally supreme in the exercise of the powers not delegated by nor inhibited to them; that the states exercise their powers over everything connected with their social and internal condition; and that over these subjects the federal government had no power. "They appertain to the State sovereignty as exclusively as powers exclusively delegated appertain to the general government."

In *Tarble's Case,* 13 Wall. 397, Mr. Justice Field, after pointing out that the general government and the state are separate and distinct sovereignties, acting separately and independently of each other within their respective spheres, said that, except in one particular, they stood in the same independent relation to each other as they would if their authority embraced distinct territories. The one particular referred to is that of the supremacy of the authority of the United States in case of conflict between the two.

In *Farrington* v. *Tennessee,* 95 U. S. 679, 685, this court said, "Yet every State has a sphere of action where the authority of the national government may not intrude. Within that domain the State is as if the union were not. Such are the checks and balances in our complicated but wise system of State and national polity."

"The powers exclusively given to the federal government," it was said in *Worcester* v. *Georgia,* 6 Pet. 515, 570, "are limitations upon the state authorities. But,

with the exception of these limitations, the states are supreme; and their sovereignty can be no more invaded by the action of the general government, than the action of the state governments can arrest or obstruct the course of the national power."

The force of what has been said is not broken by an acceptance of the view that the state is not *coerced* by the federal law. The effect of the dual distribution of powers is completely to deny to the states whatever is granted exclusively to the nation, and, conversely, to deny to the nation whatever is reserved exclusively to the states. "The determination of the Framers Convention and the ratifying conventions to preserve complete and unimpaired state self-government in all matters not committed to the general government is one of the plainest facts which emerge from the history of their deliberations. And adherence to that determination is incumbent equally upon the federal government and the states. State powers can neither be appropriated on the one hand nor abdicated on the other." *Carter* v. *Carter Coal Co., supra,* p. 295. The purpose of the Constitution in that regard does not admit of doubt or qualification; and it can be thwarted no more by voluntary surrender from within than by invasion from without.

Nor may the constitutional objection suggested be overcome by the expectation of public benefit resulting from the federal participation authorized by the act. Such expectation, if voiced in support of a proposed constitutional enactment, would be quite proper for the consideration of the legislative body. But, as we said in the *Carter* case, *supra,* p. 291—"nothing is more certain than that beneficent aims, however great or well directed, can never serve in lieu of constitutional power." Moreover, everything which the act seeks to do for the relief of unemployment might have been accomplished, as is done by this same act for the relief of the misfortunes of old age, with-

out obliging the state to surrender, or share with another government, any of its powers.

If we are to survive as the United *States,* the balance between the powers of the nation and those of the states must be maintained. There is grave danger in permitting it to dip in either direction, danger—if there were no other—in the precedent thereby set for further departures from the equipoise. The threat implicit in the present encroachment upon the administrative functions of the states is that greater encroachments, and encroachments upon other functions, will follow.

For the foregoing reasons, I think the judgment below should be reversed.

MR. JUSTICE VAN DEVANTER joins in this opinion.

MR. JUSTICE BUTLER, dissenting.

I think that the objections to the challenged enactment expressed in the separate opinions of MR. JUSTICE MC-REYNOLDS and MR. JUSTICE SUTHERLAND are well taken. I am also of opinion that, in principle and as applied to bring about and to gain control over state unemployment compensation, the statutory scheme is repugnant to the Tenth Amendment: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The Constitution grants to the United States no power to pay unemployed persons or to require the States to enact laws or to raise or disburse money for that purpose. The provisions in question, if not amounting to coercion in a legal sense, are manifestly designed and intended directly to affect state action in the respects specified. And, if valid as so employed, this "tax and credit" device may be made effective to enable federal authorities to induce, if not indeed to compel, state enactments for any purpose within the realm of

state power, and generally to control state administration of state laws.

The Act creates a Social Security Board and imposes upon it the duty of studying and making recommendations as to legislation and as to administrative policies concerning unemployment compensation and related subjects. § 702. It authorizes grants of money by the United States to States for old age assistance, for administration of unemployment compensation, for aid to dependent children, for maternal and child welfare and for public health. Each grant depends upon state compliance with conditions prescribed by federal authority. The amounts given being within the discretion of the Congress, it may at any time make available federal money sufficient effectively to influence state policy, standards and details of administration.

The excise laid by § 901 is limited to specified employers. It is not imposed to raise money to pay unemployment compensation. But it is imposed having regard to that subject; for, upon enactment of state laws for that purpose in conformity with federal requirements specified in the Act, each of the employers subject to the federal tax becomes entitled to credit for the amount he pays into an unemployment fund under a state law up to 90 per cent. of the federal tax. The amounts yielded by the remaining 10 per cent., not assigned to any specific purpose, may be applied to pay the federal contributions and expenses in respect of state unemployment compensation. It is not yet possible to determine more closely the sums that will be needed for these purposes.

When the federal Act was passed Wisconsin was the only State paying unemployment compensation. Though her plan then in force is by students of the subject generally deemed the best yet devised, she found it necessary to change her law in order to secure federal approval. In the absence of that, Wisconsin employers subject to the

federal tax would not have been allowed any deduction on account of their contribution to the state fund. Any State would be moved to conform to federal requirements, not utterly objectionable, in order to save its taxpayers from the federal tax imposed in addition to the contributions under state laws.

Federal agencies prepared and took draft bills to state legislatures to enable and induce them to pass laws providing for unemployment compensation in accordance with federal requirements, and thus to obtain relief for the employers from the impending federal exaction. Obviously the Act creates the peril of federal tax not to raise revenue but to persuade. Of course, each State was free to reject any measure so proposed. But, if it failed to adopt a plan acceptable to federal authority, the full burden of the federal tax would be exacted. And, as federal demands similarly conditioned may be increased from time to time as Congress shall determine, possible federal pressure in that field is without limit. Already at least 43 States, yielding to the inducement resulting immediately from the application of the federal tax and credit device, have provided for unemployment compensation in form to merit approval of the Social Security Board. Presumably the remaining States will comply whenever convenient for their legislatures to pass the necessary laws.

The terms of the measure make it clear that the tax and credit device was intended to enable federal officers virtually to control the exertion of powers of the States in a field in which they alone have jurisdiction and from which the United States is by the Constitution excluded.

I am of opinion that the judgment of the Circuit Court of Appeals should be reversed.