## UNITED STATES v. PAINTERS LOCAL UNION NO. 481 et al.

No. 8086 Criminal.

District Court, D. Connecticut.
July 28, 1948.

518

within the definition of the Corrupt Practices Act as amended by Sec. 304 of the Labor Management Relations Act of 1947, 2 U.S.C.A. § 251, violated that amended Act by expending union funds to pay the costs of an advertisement in the Hartford Times, of Hartford, Connecticut, and of a radio broadcast over radio station "WK-NB" of New Britain, Connecticut, advocating the defeat of certain persons in connection with conventions to be held to select candidates for Presidential and Vice-Presidential electors, and for a coming Congressional election. John R. O'Brien is similarly charged as a co-defendant, in that as president of the union-defendant, he knowingly consented to the making of the expenditures described. For aught that appears in the indictment, and as is well-known in the Connecticut community, the Hartford Times is a commercial newspaper of general circulation and WKNB is a commercial radio station of the usual type, each owned and conducted by a private corporation neither owned nor controlled by the defendants herein or by any affiliated labor organization.

This indictment the defendants have moved to dismiss, the motion being based solely on the contention that Sec. 304 of the Labor Management Act of 1947 is unconstitutional. The principal contention is that the challenged Act violates the First Amendment, but the defendants also contend that the Act violates the Fifth, Sixth, Ninth and Tenth Amendments also.

At the outset it must be noted that this is not a case like United States v. C.I.O. and Philip Murray, 68 S.Ct. 1349 (which I will refer to as the "C.I.O. case") which was held not to fall within the scope of the Act because it involved—so far as the indictment showed—only expenditures by a union to meet the costs of publishing an issue of a weekly union periodical which contained expressions of political advocacy and opinion in connection with a Congressional election and of distributing the same to those regularly entitled to receive the same. Here the charge is that in connection with a federal election and a national political convention for the selection of Presidential electors union monies were expended for a publication of

T. Vincent Quinn, Asst. Atty. Gen., Adrian W. Maher, U. S. Atty., of New Haven, Conn., Jesse Climenko and Turner L. Smith, Sp. Assts., to Atty. Gen., and Roscoe L. Barrow, Leo Meltzer, and Beatrice Rosenberg, all of Washington, D. C., for plaintiff.

J. Albert Woll, Herbert S. Thatcher, and James A. Glenn, all of Washington, D. C., and William S. Gordon, Jr, and Mary C. Fitzgerald, both of Hartford, Conn., for defendants.

HINCKS, District Judge.

The indictment in this case charges that Painters Local Union No. 481, which without dispute is a labor organization

expressions of political advocacy intended to affect the result of the election and the action of the convention in an established newspaper of general circulation and for a broadcast by a commercial radio station serving the general public. Neither on argument nor on brief was it suggested that expenditures for such purposes lay outside the intended scope of the Act. In any event, the Congressional history of the Act makes it abundantly plain that the expenditures upon which this prosecution is based were of that very kind which Congress intended to forbid. Thus the motion here cannot be disposed of without a ruling on the constitutional questions which have been raised. And since in the C.I.O. case, supra, the opinion of the court expressly withheld expression of its view as to the constitutionality of the Act, I take it as my responsibility to treat this case as one of first impression and consider the constitutional issue without constraint by the dissenting opinion in that case.

The Act now challenged traces back to the Act of January 26, 1907, 34 Stat. 864, which had forbidden federal corporations, such as national banks, to make money contributions in connection with any election, state or federal, and other, or non-federal, corporations to make such contributions in connection with federal elections. As was observed in the opinion of the Supreme Court in the C.I.O. case, the legislation was motivated by a desire to destroy the influence over elections which corporations exercised through financial contributions and also by a feeling that corporate officials had no moral right to use corporate funds for contribution to political parties without the consent of the stockholders. However, that the legislative objective was broader than a desire to guard against venal corruption more clearly appeared in subsequent Congressional debates which resulted in the development of the original Act into the Federal Corrupt Practices Act of 1925, 43 Stat. 1070, 2 U.S.C.A. § 241 et seq. In this connection the late Senator Robinson said:

"We all know * * * that one of the great political evils of the time is the apparent hold on political parties which business interests and certain organizations seek and sometimes obtain by reason of liberal campaign contributions. Many believe that when an individual or association of individuals makes large contributions for the purpose of aiding candidates of political parties in winning the elections, they expect, and sometimes demand, and occasionally, at least, receive, consideration by the beneficiaries of their contributions which not infrequently is harmful to the general public interest. It is unquestionably an evil which ought to be dealt with, and dealt with intelligently and effectively." 65 C.R. 9507.

Then, in 1943, after widespread public indignation had resulted from the spectacle of strikes in war time, came the War Labor Disputes Act of 1943, 57 Stat. 167, 2 U.S.C.A. 251, wherein, for the duration of the war, labor organizations were grouped with non-federal corporations and forbidden to make contributions in connection with federal elections. This restriction upon labor organizations traced its origin to a bill, 78th Cong. 1st Sess., H.R. 1483, upon which the House Committee on Labor had held hearings at which the view was expressed that labor organizations by large contributions to political parties could obtain undue influence and control over successfully supported candidates. In these hearings reference was made to the contribution of $500,000 by a specified union to a political party in the 1936 campaign.

Thereafter Congressional committees were set up to investigate campaign expenditures. The reports of these committees showed that subsequent to the War Labor Disputes Act labor organizations which operated on a nationwide basis had sought to justify the propriety of large expenditures in behalf of or in opposition to certain candidates seeking nomination for office by the contentions that the expenditures were not (1) "contributions" since not made directly to the favored candidate or to any political agency, and (2) were not made in connection with federal elections. House Special Committee to Investigate Campaign Expenditures, 78th Congress, 2d Sess., Report 2093; 79th Congress, 2d Sess., House Report 2739. Special Committee to Investigate Senatorial Cam-

paign Expenses, 80th Congress, 1st Sess., Report No. 1, Part 2. These committees, therefore, by majority report recommended that these "loop-holes" in the existing law be closed and accordingly by Sec. 304 of the Labor Management Relations Act of 1947, the Federal Corrupt Practices Act was amended by permanently including labor organizations with non-federal corporations as the objects of restrictive regulation and by broadening the scope of pre-existing restrictions to include "expenditures" (as well as *contributions)* in connection with *primaries and conventions* to select candidates for federal office (as well as in connection with *elections* to federal offices).

The Act should be interpreted not only in the light of the legislative history but also against the unfolding background. In the first decade of the century, we can readily recall, there was widespread concern lest the large corporations—the "trusts" as they were then invidiously called—by an accession to political power should provide for themselves further "special privileges" which should serve to pyramid their economic power. Thus in November, 1904, Alton B. Parker, the unsuccessful candidate for the Presidency on the Democratic ticket said:

"The greatest moral question which now confronts us is, shall the trusts and corporations be prevented from contributing money to control or aid in controlling elections."

And President Theodore Roosevelt in his message to Congress of December 4, 1906, said:

"I again recommend the law prohibiting all corporations from contributing to the campaign expenses of any party. * * * Let individuals contribute as they desire; but let us prohibit in effective fashion all corporations from making contributions for any political purpose, directly or indirectly."

These opinions were buttressed by the public concern over the disclosure of the Armstrong Committee in New York State in 1906, that a single corporation had contributed $50,000 to a political party in the preceding Presidential campaign and resulted in the original enactment of 1907.

A generation passed, and as so often happens history repeated itself. Aggregations other than industrial corporations—labor organizations—were vested with special economic privileges. Among the principal sources of these special privileges might be mentioned the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., and Sec. 20 of the Clayton Act, 29 U.S.C.A. § 52, by which, as was held in *United States v. Hutcheson,* 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, labor organizations were immunized from prosecution under the Sherman Anti-Trust Act, 15 U.S.C.A. § 1–7, 15 note. Fed by such special privileges and immunities, it is common knowledge, the economic power of labor organizations enjoyed lush growth until by nation-wide strikes in basic industries they could, and occasionally did, accomplish a paralysis of the national economy. Concurrently, these new aggregations of economic power, like the "trusts" of the preceding generation, began to seek increasing political power as well. That this policy on the part of labor organizations was apparent to Congress was clearly shown by the legislative history of the challenged Act, already briefly referred to: it was given vivid illustration at the time of the railroad strike in 1946. At the height of that crisis that President of the United States in a nation-wide radio address with reference to recalcitrant leaders of the striking unions said: "It is inconceivable that in a democracy any two men should be placed in a position where they can completely stifle our economy and ultimately destroy our country. The Government is challenged as seldom before in our history. It must meet the challenge or confess its impotence." New York Times, May 25, 1946. And after the President on the following day in a special message to the Congress had recommended legislation containing such curbs on the power of labor organizations as were believed by him to be necessary to protect the country from the calamity of such strikes, and after the House of Representatives had promptly passed such a bill, one of the labor leaders referred to above was quoted in the public press as saying:

"We are the richest labor organization. My Board of Directors already has authorized me to spend $2,500,000 to defeat the members of Congress who have voted for the shackling labor legislation Mr. Truman proposed. I'm going to spend it where it will do the most good."

And the same leader was reported as having said that his union would use the $47,000,000 in its treasury if necessary to defeat the President if he should seek re-election in 1948. New York Times, May 27, 1948.

In the light of the legislative history of the Act in silhouette against the contemporary background, I hold, first, that the Act was well within the limits of federal legislative power and, second, that it was not invalidated by its incidental effect in restraint upon the freedoms protected by the First Amendment. The constitutionality of the Act in its earlier dimensions, when its prohibition was directed only against corporations was sustained in United States v. United States Brewers Association, D.C. 1916, 239 F. 163, and unincorporated aggregations in my opinion, though doubtless distinguishable for many purposes, are equally within the reach both of the Congressional objective and of Congressional power.

The challenged Act, I think, may be justified as a measure believed to be necessary to ensure public confidence that official action especially in the wide realm of policy-making is shaped by due regard for the welfare of the country as a whole unaffected by political largesse from specially privileged aggregations. Surely Congress had implied power to grapple with the very evil described in the remarks of Senator Robinson, quoted above, which only the politically naive would fail to recognize. United States v. Wurzbach, 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508; United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754; Ex parte Curtis, 106 U.S. 371, 1 S.Ct. 381, 27 L.Ed. 232.

The challenged Act, I think, was also within the exercise of legislative power granted by Art. 1, Sec. 4 of the Constitution, which gave Congress power to make or alter regulations as to the manner of holding elections for Senators and Representatives, and by Art. 1, Sec. 8, Clause 18 which gave Congress power "to make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Under these broad grants Congress has long assumed to surround the entire federal election process with such rules and regulations as it deemed necessary and advisable to preserve the basic elective system contemplated by the Constitution. 2 U.S.C.A. §§ 242, 250; 18 U.S.C.A. §§ 61, 62. The Supreme Court has repeatedly recognized the broad scope of this power. In re Coy, 127 U.S. 731, 752, 8 S.Ct. 1263, 32 L.Ed. 274; United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355; Ex parte Yarbrough, 110 U.S. 651, 666, 667, 4 S.Ct. 152, 28 L.Ed. 274; Burroughs and Cannon v. United States, 290 U.S. 534, 544, 54 S.Ct. 287, 78 L.Ed. 484; Smiley v. Holm, 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed. 795; United States v. Classic, 313 U.S. 299, 320, 61 S.Ct. 1031, 85 L.Ed. 1368. The political power of the great body of individual electors which under the American elective system holds the ultimate political power, Constitution, Art. 1, Sec. 2, may be seriously cramped or even destroyed if opposed by the concentrated wealth of great corporations or labor organizations which though derived from many are controlled by a few. The relative advantage to aggregations, if not restricted as to their expenditures, is accentuated by comparison with other limitations already a part of federal law. Thus it will be noted that the maximum campaign expenditures which may lawfully be made by candidates for federal elective office are, with certain exceptions, 2 U.S.C.A. § 248(c), $25,000 by candidates for Senator and $5,000 by candidates for Representative, 2 U.S.C.A. § 248(b). Persons other than candidates are limited in their contributions (direct or indirect) to campaigns for federal elective office to $5,000. 18 U.S.C.A. § 61m. And even the great national political committees are limited to $3,000,000 as the amount which they may receive or expend in any calendar year. 18 U.S.C.A. § 61t. In elections subject to such restrictions if the expenditures of aggregations be not restricted, it is apparent

that the votes of individuals may not "count" as they would in an election fairly conducted. As Justice Holmes said, "the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in the box." ·United States v. Mosley, supra [238 U.S. 383, 35 S.Ct. 905]. In this aspect, the Act may be viewed as an intended safeguard of the elective system essential to our basic governmental structure and as such well within the grant of federal power under the Constitution.

■■ The safeguard, I hold, was none the less within the scope of constitutional power if to achieve its objective Congress deliberately sought to curb the political power of aggregations having also great economic power. Surely a people who have under their Constitution retained the ultimate political power are not constrained to sit in helpless acquiescence while the power of life or death over the nation is brought into the hands of those comparatively few in number, who direct specially privileged aggregations either of labor or of capital. They may take appropriate steps while yet there is time to bring the power of such aggregations, both their political and their economic power, within bounds deemed consonant with the institutions of the Republic. The challenged Act stands as the voice of the people speaking through their representatives in Congress assembled. If, as the defendants seem to think, the people of the nation do not approve the long range policy enunciated by their representatives, under our republican form of government it is for the electors, not the judges, to say so. The political arena, not the judicial forum, is the proper place for the settlement of the contentions now raised.

At first glance, at least, it would not seem that an Act which goes no further than to regulate aggregations both of capital and of labor in their expenditures could be deemed, as the defendants contend, an unlawful abridgment of the rights of free speech, press and assembly. But even if the Act does result in some incidental restrictions of rights protected by the First Amendment, it does not necessarily follow that an unlawful abridgment has resulted. For the rights protected by the First Amendment are not absolute: it is well established that they are subject to reasonable restrictions when necessary to safeguard the public interest. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; Whitney v. California, 274 U.S. 357, 371, 47 S.Ct. 641, 71 L.Ed. 1095; Frohwerk v. United States, 249 U.S. 204, 206, 39 S.Ct. 249, 63 L.Ed. 561; United Public Workers v. Mitchell, 330 U.S. 75, 96, 67 S.Ct. 556, 91 L.Ed. 754; Hague v. C. I. O., 307 U.S. 496, 515, 516, 59 S.Ct. 954, 83 L.Ed. 1423. In each case in which an exercise of a constitutional legislative power comes into conflict with the freedoms protected by the First Amendment the validity of the legislation in the last analysis will depend upon a balance of the several factors affecting the public interest. Cf. Saia v. New York, 68 S.Ct. 1148. Thus, other factors being of equal weight, concern for a truly fundamental right must prevail over solicitude for conflicting rights which though fundamental are comparatively, at least, of less importance. This was recognized even in the dissenting opinion of Justice Brandeis, Justice Holmes concurring, in Whitney v. California, supra, where it was said: "But, although the rights of free speech and assembly are fundamental, they are not in their nature absolute. Their exercise is subject to restriction, if the particular restriction proposed is required in order to protect the state from destruction or from serious injury, political, economic or moral." 274 U.S. at page 373, 47 S.Ct. at page 647. Nevertheless, presence of a predominant right may not be allowed to obscure the freedoms of the First Amendment which must be preserved as fully as the public interest will permit. Thus the problem includes as factors the respective qualities of the rights in conflict and the reactions of any incidental restraints on individual freedoms and the public interest.

■ Applying these principles to the case at hand, I hold that the right of the people by free elections to keep the control of their own government is truly fundamental and preponderant even over the freedoms of the First Amendment. With that right gone the ultimate power of the people to enforce their other constitutional rights will also be gone: enforcement

thereafter will occur only as a matter of grace.

■ As to the scope and effect of the incidental restraints of the Act, even the defendants seem not to contend that a prohibition of "contributions" could be deemed an abridgment of their constitutional freedoms. But they do say: "to ban expenditures made to facilitate the expression of opinion is to prohibit the expression itself, for without expenditures the communications media are not available." They also condemn the Act because of its tendency to restrict the public right to hear and to read, which they contend, rightfully I think, is comprehended in the right of free speech and free press.

These claims as to the effect of the Act are unduly extreme. In the first place, they ignore the limitations of the statutory restriction of expenditures to those made "in connection with" Presidential and Congressional elections, primaries, etc.: only such expenditures are banned. As to the interpretation of this limitation I will comment at a later point in this opinion: on the immediate point it is enough to note that although expenditures made for electioneering are banned, so far as this Act provides expenditures may still be made for lobbying or to publicize any political or economic position whatever as, for example, position as to pending legislation, State or federal, or even advocacy and active electioneering in connection with State elections and primaries. Thus the effect of the Act upon the interactions between the specified aggregations and elected officers of the federal government is to restrict not at all requests for official action which are based upon reason: only political reprisals by powerful aggregations against individual officials are banned.

Secondly, the Act does not restrict any exercise of free speech, press or assembly which can be accomplished without expense to a labor organization. Thus a labor organization, just as freely as a corporation, is still left with unrestricted liberty to speak and publish, and even to electioneer in federal elections, through its officers and its multitudinous members and friends in so far as they are willing to speak, write and print without special recompense from the organization. Such material may lawfully be publicized even at incidental expense to the organization in organizational periodicals for distribution to its members, as was held in the C. I. O. case, and if without expense to the organization by the public press and by public broadcasting stations for the benefit of the general public. Indeed, in so far as such publicity material is found to be of sufficient public interest to be newsworthy, there is every practical assurance that it will be published and broadcast without expense to the organization.

Thirdly, the defendants also seem to overlook the fact that, much as restrictions are necessary for the enjoyment of many property rights, a restriction on the freedoms of a few is often a much-needed safeguard for the enjoyment of their freedoms by the many. This is so because of the natural limitations upon the human capacity and opportunity to speak and publish, to hear and read. Cf. National Broadcasting Co. v. United States, 319 U.S. 190, 226, 63 S.Ct. 997, 87 L.Ed. 1344. Neither the written or spoken word is protected for its intrinsic value: it is precious and protected because it serves as the vehicle of human understanding. Obviously, the right to speak is of value only if it may be exercised under such surroundings that one may be heard: the right to publish has value only to the extent that there are available readers with the inclination and leisure for reading. If the aggregations specified in this legislation in a thirst for political power are allowed to use their large resources to smother the individual electors with words at election time when so many want to hear and be heard, the practical result is to impair the freedoms of individuals. These reflections suggest that an aggregation may properly be subjected to more stringent regulation in the exercise of its freedoms than an individual. For the Amendment is not a sanctuary for Bedlam: it no more protects from regulation the right to filibuster either in a legislative assembly or town meeting, or the right to absorb more than a fair share of public attention, than the right of assembly protects a right to throw picket lines around the voting places.

I think, therefore, that the defendants greatly exaggerate when they contend that the challenged Act involves a total suppression of constitutional freedoms or ·of· political activity. Nevertheless, it must be recognized that the practical effect of the Act is incidentally to restrict the publicity which could otherwise be procured for its expressions by organizations having funds available for the purchase of publicity.

If it is true that the danger which Congress sought to reach was the acquisition of political power by aggregations of great economic power the management of which was in the immediate direction of a few, it might be urged that the danger was one that Congress could have met by a major curtailment of the economic power of labor organizations without at all trenching upon their freedoms. For instance, a short enactment providing that no longer should labor organizations be immune from prosecution under the Sherman Act quite possibly within a short space of time would have so emasculated the economic power and financial resources of labor organizations that the expenditure of any monies available to them for the purchase of publicity in federal elections would have been too small to constitute any real danger to free elections. However, as the very text of the Labor-Management Relations Act shows, Congress deemed it preferable to make no major reduction in the economic power of labor organizations believing, apparently, that their continued power in the economic field would be of public benefit and not necessarily a source of danger if not supplemented by unrestricted political power as well. To hold that Congress could safeguard the institution of free elections only by the sacrifice of an economic institution believed still to have a useful public function, would be novel doctrine for which I find no authority. In Saia v. New York, supra [68 S.Ct. 1151], it was recognized that in passing on the constitutionality of local regulations "courts must balance the various community interests." And in United Public Workers v. Mitchell, 330 U. S. 75, 67 S.Ct. 556, 91 L.Ed. 754, it was held that the public interest might justify a restriction upon the political activity of federal employees. The same underlying principle applies here and I hold the Act not invalid because of its incidental restriction on the political activities of aggregations which owe their strength to special privileges and immunities conferred upon them for their discharge of a public economic function.

The defendants invoke the doctrine of such cases as Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155, for the proposition that regulatory legislation, especially when its effect is to restrict the freedoms of the First Amendment, can be sustained only when drawn narrowly to meet some specific evil. But this argument overlooks the fact that Congress may well have considered this corrective measure required not to protect the country from some ephemeral annoyance or narrow evil but rather from a situation which constituted a broader menace to the body politic—the growing concentration of excessive power in special groups. Certainly, it cannot be said that the regulatory measure adopted, with its incidental but limited restrictions on group freedoms, was disproportionate to such a danger.

The defendants contend that the restriction on their political activities can be sustained only if a court having jurisdiction shall re-examine the legislative act and concur in the view that it was necessary to safeguard some public interest from clear and present danger, citing such cases as Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430; Bridges v. California, 314 U.S. 252, 263, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; but in United Public Workers v. Mitchell, supra [330 U.S. 75, 67 S.Ct. 571], it was said that the court would not intervene to invalidate an Act of Congress regulating the political activities of federal employees unless the regulation "passes beyond the generally existing conception of governmental power" which was defined as that conception which "develops from practice, history, and changing educational, social and economic conditions."

There is no need for me to make a choice between these doctrinal expressions of high authority: the situation here meets the test of either rule. It will not be disputed

that the public has a vital interest in a system of free elections as also in a system of labor unions competent to perform their economic functions. That contemporary labor organizations have acquired vast economic power and financial means is equally apparent to the observer of the contemporary scene: This fact was publicly acknowledged by the Chief Executive of the United States in his radio address referred to above at the time of the railroad strike of 1946 and it was recognized in the opinion of the Supreme Court (March, 1947) in United States v. United Mine Workers, 330 U.S. 258, at page 303, 67 S.Ct. 677, at page 701, 91 L.Ed. 884, where the court said that the policy of the union there involved "was the germ center of an economic paralysis which was rapidly extending itself from the bituminous coal mines into practically every other major industry of the United States." And when it became apparent that these goliaths, already vested with economic power to strangle the nation, were seeking political power as well, if it be my responsibility as a judicial officer to obtrude my own views in the premises, in conformity with the high testimony above mentioned I should conclude, as did the Congress, that forces were already in motion which if allowed to accumulate further strength might work a transfer of the ultimate political power from the great body of electors to those directing the activities of minority groups. And such a transfer, obviously, might be accomplished in a single national election.

On the other hand, the recent history of the growth of federal power coupled with the economic and social developments of the last two decades, and, more specifically, the legislative history of the challenged Act unmistakably reflect a contemporary conception of federal power which satisfies the rule of the Mitchell case. Cf. United States v. Wurzbach, 280 U.S. 396, 397, 50 S.Ct. 167, 74 L.Ed. 508.

The defendants rely heavily on Bowe v. Commonwealth, 320 Mass. 230, 69 N.E.2d 115, 120, 167 A.L.R. 1447. That case concerned a proposed law initiated by ten Massachusetts voters prohibiting labor unions as well as corporations from contributing or expending to "promote or prevent the nom-

ination or election of any person to public office, or to aid, promote or antagonize the interests of any political party or to influence or affect the vote on any question submitted to the voters." This went farther than the Act involved here: as the court there said the effect of the Act was not to regulate but substantially to destroy the right of labor unions to engage in political activities. So far as the opinion showed there was nothing before the Massachusetts court to indicate any need for such drastic restriction; nothing to show that labor unions were the recipients of any special privileges under the laws of Massachusetts or were for any reason subject to more drastic restriction than individuals. As legislation only proposed it had neither legislative history nor endorsement by any legislative body. In such circumstances the order of the Massachusetts Court commanding that this proposed law—the brainchild of ten voters not apparently directly represented in the litigation—be not submitted to the electorate is scant authority for striking down a carefully considered Act of the Congress of the United States. Especially is this so when the Massachusetts Court expressly said, "What we must decide is not whether the proposed law would abridge these freedoms as they exist under the Federal Constitution, but whether the proposed law would abridge them as they exist under the Massachusetts Declaration of Rights." Here I have a different task and a decision to make on different facts as seen against a different background. I hold the Act here under challenge not invalid for its incidental restraints on the specified aggregations.

The defendants further urge that the Act offends the Fifth and Sixth Amendments in that it is too vague and indefinite to furnish a reasonably ascertainable standard of guilt: in this connection they invoke the doctrine of such cases as Connally v. General Construction Company, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322; United States v. Cohen Grocery Co., 255 U. S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045; and Lanzetta v. New Jersey, 306 U. S. 451, 59 S.Ct. 618, 83 L.Ed. 888.

The Act was plainly intended to prohibit the conduct which is the subject matter of

526

the instant indictment: this even the defendants seem not to dispute. It may be doubted therefore that they have any standing to complain that the text of the Act did not fairly warn them that their acts had been made subject to criminal sanctions. United States v. Wurzbach, supra; Robinson v. United States, 324 U.S. 282, 286, 65 S.Ct. 666, 89 L.Ed. 944; Fox v. Washington, 236 U.S. 273, 277, 35 S.Ct. 383, 59 L. Ed. 573. And even if under the act "there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact or situation falls (that incident) is no sufficient reason to hold the language too ambiguous to define a criminal offense." United States v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877. See also United States v. Wurzbach, supra, and Robinson v. United States, supra.

However that may be, I cannot agree that this criticism of the Act has real substance. It may be noted that the Hatch Act is equally vulnerable in that it bans various acts done "in connection with any campaign for nomination or election, etc." 18 U.S.C.A. § 61m. That Act was given enforcement in United Public Workers v. Mitchell, supra, although, to be sure, so far as the opinion in that case shows the Act was not actually attacked on the ground of indefiniteness.

In United States v. Wurzbach, supra [280 U.S. 396, 397, 50 S.Ct. 169], the same criticism was made of an Act which made it illegal for a federal employee to "be in any manner concerned in soliciting or receiving, any assessment, subscription, or contribution for any political purpose." 18 U.S.C.A. § 208. As to this Justice Holmes said:

"But we imagine that no one not in search of trouble would feel any. Wherever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so, it is familiar to the criminal law to make him take the risk Nash v. United States, 229 U.S. 373, 33 S. St. 780, 57 L.Ed. 1232."

The phrase "in connection with" a federal election which is now criticized is one which traces back to the Act of 1907 forbidding corporations to make political contributions. The phrase was incorporated in the Act of 1910, 36 Stat. 824, which was succeeded by the Federal Corrupt Practices Act of 1925. These required the filing of statements of expenditures by persons (other than political committees) "for the purpose of influencing * * * the election," 2 U.S.C.A. § 245, and of statements by candidates, 2 U.S.C.A. § 246(a), of contributions received and expenditures made by him "for the purpose of influencing the result of the election." Thus for a full generation in a comprehensive piece of legislation an interdiction of "contributions in connection with", federal elections had lain cheek by jowl with requirements for filing statements of contributions and expenditures "for the purpose of influencing the result of the election." And so when Congress in the Labor Management Relations Act of 1947 extended the prohibition to include expenditures (as well as contributions) "in connection with" elections it is plain enough that it meant to prohibit expenditures for the purpose of influencing the result of elections. The Act should be so construed.

■ There is no room for the claim that the Act thus construed is fatally vague. Careful analysis of the cases on which the defendants rely for their position on this point discloses that in the statutes held fatally indefinite a specific intent was lacking as an element of the offense denounced. It is well established that no defendant can claim that he was not fairly apprised of the legislative standard of guilt when the statute forbids only acts knowingly done for a specific purpose. United States v. Ragen, 314 U.S. 513, 523, 62 S.Ct. 374, 86 L.Ed. 383; Gorin v. United States, 312 U.S. 19, 27, 61 S.Ct. 429, 85 L.Ed. 488; Screws v. United States, 325 U.S. 91, 101, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330; Omaechevarria v. Idaho, 246 U.S. 343, 348, 38 S.Ct. 323, 62 L.Ed. 763; Hygrade Provision Co. v. Sherman, 266 U.S. 497, 502, 45 S.Ct. 141, 69 L.Ed. 402. As was said in United States v. Ragen, supra [314 U.S. 513, 523, 62 S.Ct. 379]: "On no construc-

tion can the statutory provisions here involved become a trap for those who act in good faith. A mind intent upon willful evasion is inconsistent with surprised innocence."

■■■■ Equally untenable is the defendants' contention that the challenged Act so discriminated against labor organizations as to constitute a wholly arbitrary deprivation without due process of law contrary to the Fifth Amendment. As the defendants themselves recognize the Fifth Amendment, unlike the Fourteenth, contains no "equal protection" clause. In that respect its restraints are "less narrow and confining" than those of the equal protection clause. Steward Machine Co. v. Davis, 301 U.S. 548, 584, 57 S.Ct. 883, 889, 81 L. Ed. 1279, 109 A.L.R. 1293. Whatever may be the rule when an alleged violation of the First Amendment is involved, certainly the mere fact that these defendants by motion charge the Congress of the United States with violation of the Fifth Amendment does not serve to shift the burden of justification or to subject the sovereign, acting either by Congress or by the executive branch in its prosecutory function, to demonstrate either by evidence or argument that the Act was not arbitrary but instead had a scope and content reasonably appropriate as a corrective of the conditions which Congress viewed as dangerous. At any rate, the Congressional history of the Act as noted above showed that when it developed that large political contributions were being made by corporations Congress acted; and when a generation later large political contributions for election purposes were being made by labor organizations Congress acted; and when thereafter it appeared that labor organizations were circumventing the intended prohibition in the War Labor Disputes Act against contributions for electioneering by making large expenditures in connection with elections in the guise of "education," etc., now again Congress has acted. When Congress successively has regulated only those aggregations shown to have been making large expenditures to influence election results it does not follow that it acted arbitrarily when it failed to regulate other unincorporated aggregations, such as manufacturers' or Employers' associations, which were not shown to have made such contributions and expenditures of sufficient volume to be of any public importance whatever. Indeed, when this very point was raised in the Senate debates on the legislation now challenged one of its sponsors replied: " * * * if any abuses arise with respect to other organizations we can extend the provision of law to the other groups." Certainly that position is not open to valid criticism on constitutional grounds. As was said in Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774, which the defendants themselves cite, "Congress may hit at a particular danger where it is seen, without providing for others which are not so evident or so urgent." And in Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 1394, 89 L.Ed. 1725, it was said:

"The Constitution does not oblige a state to regulate or reform all types of associations and organizations, or none. It may begin with such as in its judgment most need regulation."

See also National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 46, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

■■■■ Finally, the contention that the Act violates the Ninth and Tenth Amendments in that it invades rights reserved to the States is left wholly without substance if, as I have held above, the grant of powers to the Union under the Constitution includes either expressly or by implication the power which the Congress has exercised in this enactment. As was said in United Public Workers v. Mitchell, 330 U.S. 75, at page 96, 67 S.Ct. 556, at page 567, 91 L.Ed. 754:

"When objection is made that the exercise of a federal power infringes upon rights reserved by the Ninth and Tenth Amendments, the inquiry must be directed toward the granted power under which the action of the Union was taken. If granted power is found, necessarily the objection of invasion of those rights, reserved by the Ninth and Tenth Amendments, must fail."

528

I conclude that the Act is not invalid: the powers exercised were powers granted to Congress under the Constitution and the Congressional exercise thereof cannot be held to contravene the Amendments of the Constitution upon which the defendants' contentions are based.

It is ordered therefore that the motions be denied.