John C. O'Connor v. Commissioner. The O'Connor Patent Company v. Commissioner.
O'Connor v. Commissioner
Docket Nos. 55803, 55865, 62052.
United States Tax Court
T.C. Memo 1957-50; 1957 Tax Ct. Memo LEXIS 202; 16 T.C.M. (CCH) 213; T.C.M. (RIA) 57050; March 28, 1957
John C. O'Connor, 336 S. State Street, Ann Arbor, Mich., for the petitioners. Robert B. Pierce, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in income tax, personal holding company surtax and additions to tax under section 291(a) of the Internal Revenue Code of 1939 as follows: Personal Hold- Addition
Docket
Income
ing Company
to Tax
No.
Taxpayer
Year
Tax
Surtax
Sec. 291(a)
55803
John C. O'Connor
1948
$22,632.27
55865
The O'Connor Patent Company
1950 [1]
1,092.76
$4,220.88
$1,055.22
1951 [1]
2,882.68
8,986.96
2,246.74
62052
The O'Connor Patent Company
1952 [1]
1,131.94
3,007.16
751.79
1953 [1]
1,842.62
5,020.75
1,255.19
Issues for determination *204 are: (1) Whether John C. O'Connor's transfer in 1948 of patents to The O'Connor Patent Company solely in exchange for stock in that company was an exchange on which gain or loss was recognizable; (2) if the exchange was one on which gain or loss was recognizable, what was the amount thereof to be recognized as having been realized or sustained by John C. O'Connor; (3) what was the basis of the patents to The O'Connor Patent Company for the purpose of computing its allowances for depreciation of the patents for the fiscal years ending July 31, 1950 through 1953; (4) whether for the fiscal years ended July 31, 1950 through 1953 The O'Connor Patent Company was a personal holding company and subject to personal holding company surtax; and (5) whether for the fiscal years ended July 31, 1950 through 1953 The O'Connor Patent Company was liable for additions to tax under section 291(a) of the Internal Revenue Code of 1939 for failure to file personal holding company surtax returns for the respective years. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner John C. O'Connor is a resident of Ann Arbor, Michigan, has his principal office in that *205 city and filed his Federal income tax return for 1948 with the collector at Detroit, Michigan. Petitioner The O'Connor Patent Company (sometimes hereinafter referred to as the Patent Company) is a Michigan corporation, has its principal office in Ann Arbor, and filed its Federal corporation income tax returns for the fiscal years ended July 31, 1950 through 1953 with the collector at Detroit, Michigan. In 1936 John C. O'Connor graduated from the University of Michigan as an aeronautical engineer. After working for a year for an aircraft manufacturer he began an engineering business of his own. In August 1942 he entered the Army Air Corps and was stationed at Wright Field, Dayton, Ohio, until October 1945 when he left the service. Upon leaving the service he resumed the conduct of an engineering business of his own. During the period from 1936 to June 1940 O'Connor developed certain inventions, patents covering which he made application for and received. The following is a statement of the patents so received and owned by him on June 7, 1948, the dates applied for, dates issued, expiration dates, their cost to him, their adjusted cost (after adjustments for depreciation of the *206 patents allowed to O'Connor) to June 7, 1948: Adjusted
Patent
Date
Date
Expiration
Cost to
No.
Applied for
Issued
Date
Cost
June 7, 1948
U.S. 2,353,492
Vibration Producing
1/16/42
7/11/44
7/11/61
$2,100
$1,616.18
Mechanism
Canadian 431,592
Vibration Producing
10/20/44
12/ 4/45
12/ 4/62
200
170.59
Mechanism
U.S. 2,418,982
Rocking Mixer
6/ 9/44
4/15/47
4/15/64
1,000
931.37
U.S. 2,420,793
Vibratory Drilling
6/ 9/44
5/20/47
5/20/64
1,700
1,591.67
Apparatus
U.S. 2,439,219
Apparatus for
Transmitting Intense
Vibrations for Performing
6/ 9/44
4/ 6/48
4/ 6/65
1,995
1,975.44
Work
Total
$6,995
$6,285.25
U.S. Patent No. 2,353,492 was basic to all of the other United States patents heretofore mentioned and the specifications and drawings of Canadian Patent No. 431,592 are identical with those of U.S. Patent No. 2,353,492. Beginning in July 1947 and continuing through February 1948, O'Connor's sister, Edith M. O'Connor, at his request, loaned him a total of $225 which he used to pay expenses he had incurred in the development of some of the above-mentioned patents. Beginning July 1942 and continuing *207 through June 1948, O'Connor's mother, Mary L. O'Connor, at his request, loaned him a total of $841 which he used to pay expenses he had incurred in getting some of the above-mentioned patents. In addition to the above loans, O'Connor had obtained a loan of an undisclosed amount from his aunt, Margaret O'Connor, and a loan of $400 from George Kalon. All of the foregoing persons expected O'Connor to repay the sums which they had loaned him. Prior to May 17, 1948, O'Connor discussed with Edmond F. DeVine, an attorney, John B. DeVine, also an attorney, and Cyrus R. Jones, the matter of forming a corporation to acquire and exploit the patents owned by O'Connor. On May 17, 1948, O'Connor, Edmond F. DeVine, John B. DeVine, and Cyrus R. Jones (sometimes hereinafter referred to as the promoters) and Elizabeth DeVine, the mother of Edmond F. DeVine and John B. DeVine, as incorporators, duly executed the Articles of Incorporation of the Patent Company. The Articles showed the purpose of the corporation, among others, was to acquire and exploit the inventions of O'Connor. They showed the authorized capital stock of the corporation as 100,000 shares of common stock of a par value of $1 each, *208 with each share to have one vote. They further showed $51,810 as the amount of paid-in capital with which the company would begin business and showed the incorporators as having subscribed for the following number of shares of common stock: No. of Shares
Edmond F. DeVine
300
John B. DeVine
200
Elizabeth C. DeVine
300
Cyrus R. Jones
10
John C. O'Connor
51,000
Total
51,810
Edmond F. DeVine, John B. DeVine, Cyrus R. Jones and O'Connor were shown in the Articles as the first board of directors. After execution the Articles of Incorporation were mailed to the Michigan Corporation and Securities Commission and were received by it on May 19, 1948. Thereafter, on June 7, 1948, the Patent Company was duly incorporated. The first officers and directors of the Patent Company were as follows: John C. O'Connor - Chairman of Board of Directors Edmond F. DeVine - President Cyrus R. Jones - Vice President John B. DeVine - Secretary and Treasurer The foregoing persons remained in their respective offices in the Patent Company until about July 30, 1950, at which time Edmond F. DeVine and John B. DeVine resigned as directors and also resigned their respective *209 offices. Subsequently Cyrus R. Jones resigned as vice president and director. At or about the time of the resignation of the DeVines, Hadley J. Smith, Andrew W. Row, and Elinor A. Patterson became directors and the following became the officers of the company: John C. O'Connor - President Hadley J. Smith - Vice President Andrew W. Row - Vice President Elinor A. Patterson - Secretary O'Connor has continued to be president of the company. Prior to the meeting of the incorporators on May 17, 1948, O'Connor had anticipated that the Patent Company would be incorporated by not later than June 1, 1948, and he prepared a proposed contract, bearing the latter date, between him and the Patent Company. By the contract he proposed, among other things, to transfer, with certain restrictions, to the Patent Company the 4 United States patents and Canadian patent theretofore issued to him and all inventions and improvements of inventions that he might make for a period of 5 years from June 1, 1948, and that, among other things, the Patent Company issue to him 51,000 shares of its authorized capital stock of 100,000 shares and a like proportion of all future increases of its capital stock, *210 to the end that of every 100 shares of capital stock issued by the company at any time he should receive 51 shares fully paid. Although the proposed contract contained matters which he considered should not be in it, O'Connor submitted it to the promoters at their meeting on May 17, 1948, when they signed the Articles of Incorporation of the Patent Company. After the proposed contract was read and discussed by the promoters, they concluded that it should be studied by the officers of the Patent Company for the purpose of correcting errors therein and revising it so as to make it a better working agreement. The proposed contract contained no provision respecting the issuance of any portion of the foregoing 51,000 shares of Patent Company stock to anyone other than O'Connor. On various occasions following the incorporation of the Patent Company and until about July 30, 1950, when Edmond F. DeVine and John B. DeVine resigned as directors and as officers of the Patent Company, O'Connor took up with them the matter of correcting, revising, and signing the proposed contract but to no avail. On April 11, 1953, the proposed contract was signed for the Patent Company by Elinor P. O'Connor, *211 as secretary and by O'Connor. This execution by the Patent Company purported to be by authority contained in a "September 20, 1952 Supplement" to the contract. On June 7, 1948, O'Connor transferred to the Patent Company the above-mentioned United States and Canadian patents theretofore issued to him solely in exchange for 51,000 shares of the Patent Company's capital stock and immediately after the exchange he owned more than 80 per cent of all that company's capital stock. O'Connor's assignment of the United States patents which had been issued to him prior to June 7, 1948, was recorded in the United States Patent Office, Washington, D.C., on April 7, 1949, and his assignment of the Canadian patent was recorded in the Patent and Copyright Office, Ottawa, Canada, on April 9, 1949. No formal record was made of the first meeting of the board of directors of the Patent Company. The second meeting of the board was held on August 30, 1948, and in addition to other action taken at that meeting the directors authorized the president and secretary to issue to the incorporators and their assigns the 51,810 shares of the corporation's stock for which the incorporators had subscribed. Prior *212 to that meeting stock certificates had been issued to the following persons for the indicated number of shares and for the consideration shown: No. of
Shares
Consideration
Edmond F. DeVine
300
Professional
services
John B. DeVine
200
$200
Cyrus R. Jones
10
10
Elizabeth C. DeVine
300
300
Total
810
After the meeting of the board of directors on August 30, 1948, the Patent Company, at the request of O'Connor, issued the 51,000 shares of its stock, which he had acquired in exchange for patents, to the following persons in the indicated amounts, and certificates therefor were issued by the company on the dates shown: Date
No. of
Certificate
Shares
Issued
Mary L. O'Connor
5,000
8/30/48
Edith L. O'Connor
5,000
8/30/48
Margaret O'Connor
500
8/30/48
John C. O'Connor
40,000
8/30/48
George Kalon
400
8/30/48
Catherine P. Dettling
100
9/25/48
Total
51,000
Aside from O'Connor, none of the foregoing persons paid the Patent Company and consideration for the shares of stock issued to them. The 100 shares of stock in the Patent Company issued to Catherine P. Dettling represented a wedding gift made to *213 her by O'Connor. At the time O'Connor requested the company to issue 400 shares of stock to George Kalon, he was indebted to Kalon in the amount of $400 on a loan which Kalon had made to him. O'Connor sent the certificate for 400 shares to Kalon in the hope that it would be acceptable to him as payment of the indebtedness. Kalon refused to accept the stock as payment of the indebtedness, demanded cash payment of the indebtedness, and about February 1949 returned the certificate to O'Connor. Thereafter O'Connor returned the certificate to the Patent Company which canceled it. With respect to the 400 shares represented by the canceled certificate, the Patent Company thereafter, in 1949, at O'Connor's request, issued certificates to 5 other persons for a total of 365 shares. At the time of the trial no further certificate had been issued for the remaining 35 shares. The Patent Company has never issued and had outstanding more than 51,810 shares of stock. In its Annual Reports to the Michigan Corporation and Securities Commission for 1948 and 1949 for the purpose of the computation of its annual privilege fee, the Patent Company listed the 5 patents it acquired from O'Connor on June 7, 1948, as *214 having a total fair market value of $914,750 on June 7, 1948. In its Annual Report for 1950 and for subsequent years, the total fair market value of the patents was reduced from $914,750 to $342,675. The reduction was made in order to reduce the amount of the company's annual privilege fee payable to the State of Michigan. In its Federal income tax returns for the period June 7, 1948, to July 31, 1948, and for the fiscal year 1949, the Patent Company listed the above-mentioned 5 patents as having a total fair market value of $914,750 on June 7, 1948, and took deductions for depreciation of the patents computed on that amount as its basis for the patents. In its income tax returns for the fiscal years ended July 31, 1950 through 1953 the Patent Company listed the 5 patents as having a total fair market value of $342,675 on June 7, 1948, and took deductions for depreciation of the patents computed on that amount as its basis for the patents. In determining the deficiencies involved herein against the Patent Company, the respondent determined that the company acquired the patents from O'Connor on June 7, 1948, in an exchange on which no gain or loss was recognizable and that the company's *215 basis for the computation of allowances for depreciation of the patents was the adjusted cost of the patents to O'Connor on June 7, 1948, namely, $6,285.25. Accordingly the respondent disallowed the deductions taken by the Patent Company for depreciation of the patents to the extent that the deductions exceeded an amount computed on a basis of $6,285.25. Prior to October 28, 1948, the Patent Company did not license any patents and did not receive any royalties. On October 28, 1948, the Patent Company entered into an agreement with The Gene Olsen Corporation (sometimes hereinafter referred to as Olsen) whereby the Patent Company licensed to Olsen certain patents it had acquired from O'Connor. The consideration was the royalties to be paid to the Patent Company by Olsen for the privilege of using the patents and was a specified percentage of the net selling price of the machines manufactured under the license agreement. The agreement contained no provision respecting the Patent Company furnishing any engineering or other services to Olsen. On December 1, 1950, the Patent Company entered into an agreement with General Mills, Inc. (sometimes hereinafter referred to as General Mills), *216 whereby the Patent Company licensed to General Mills certain patents it had acquired from O'Connor. The consideration was payment of royalties by General Mills to the Patent Company for the privilege of using the patents and was a specific amount per linear foot of vibratory conveyor manufactured under the license agreement. The agreement contained no provision respecting the Patent Company furnishing any engineering or other personal services to General Mills. However, the agreement contained the following provision: "No Other Understandings It is understood and agreed that this written agreement cancels all previous proposals heretofore considered by the respective parties prior to the execution thereof and constitutes the entire understanding and agreement between the parties hereto relating or pertaining to the subject matter hereof." During the following fiscal years the Patent Company received the indicated amounts of royalties from Olsen and General Mills under its respective agreements with them: Royalties Received From
Fiscal Year
Ended July 31
Olsen
General Mills, Inc.
1950
$ 8,902.73
0
1951
11,150.00
$5,000.00
1952
12,049.03
0
1953
10,175.18
0
*217 During the fiscal year ended July 31, 1950, the Patent Company, under an agreement with the Vibro-Plus Corporation, dated June 9, 1950, received $1,000 from that corporation for an option and during the fiscal year ended July 31, 1951, received $1,000 from the corporation for a cancellation of the option. The foregoing amounts received by the Patent Company from Olsen, General Mills, and Vibro-Plus Corporation constituted its entire gross income for the respective years. In the years following the Patent Company's execution of the above-mentioned agreements with Olsen and General Mills, including the taxable years in question, O'Connor imposed upon Olsen and General Mills certain engineering and other services rendered by him. The respondent determined that the Patent Company was a personal holding company for the fiscal years ended July 31, 1950 through 1953 and was subject to personal holding company surtax for those years. Throughout the fiscal years ended July 31, 1950 through 1953 O'Connor owned more than 50 per cent in value of the outstanding stock of the Patent Company. More than 80 per cent of the company's gross income for each of the years was from royalties. For each *218 of the years the company was a personal holding company and was subject to personal holding company surtax. The Patent Company failed to file a personal holding company return for each of the fiscal years ended July 31, 1950 through 1953. The company's failure to file personal holding company returns was not due to reasonable cause. In determining the deficiency against petitioner John C. O'Connor, the respondent determined that on June 7, 1948, he transferred his patents to the Patent Company in an exchange on which gain or loss was recognizable and that on the exchange he realized a long-term capital gain of $100,000. Opinion The respondent contends that on June 7, 1948, the petitioner John C. O'Connor transferred his patents to the Patent Company solely in exchange for 51,000 shares of the Patent Company's stock, which was more than 80 per cent of all of the company's 51,810 shares of stock, that immediately after the exchange O'Connor was in control of the company, and that accordingly under the provisions of section 112(b)(5) of the Internal Revenue Code of 1939[1] no gain or loss was recognizable on the exchange. The petitioners also take the position that the patents *219 were transferred to the Patent Company on June 7, 1948, in exchange for 51,000 shares of its stock. However, they contend that, since only 40,000 shares of the 51,000 shares of stock were issued to O'Connor and the remainder of 11,000 shares was issued to others designated by him, he received less than 80 per cent of the Patent Company's stock and was not in control of the Patent Company immediately after the exchange and that accordingly the exchange was not one within the provisions of section 112(b)(5) but was one on which gain or loss was recognizable. *220 On brief the petitioners state that the exchange of patents for stock was made under a written contract and the stock was issued under a separate oral agreement under which less than 80 per cent of the stock was to be issued to O'Connor so that he would not have control of the Patent Company within the meaning of section 112(b)(5). The record contains no evidence of any written contract between the Patent Company and O'Connor respecting the transfer of patents by O'Connor to the company for stock except the proposed contract submitted by O'Connor to the incorporators on May 17, 1948. But that instrument was never corrected and revised as the promoters and incorporators concluded should be done, nor was it signed for the company until in April 1953 when an officer of the company purportedly pursuant to authority contained in a "September 20, 1952 Supplement" to the proposed contract signed it. The supplement referred to was not placed in evidence nor are we informed as to its contents. Since the evidence shows that the patents were acquired by the company on June 7, 1948, that some were licensed to Olsen in October 1948, and some licensed to General Mills in December 1950, we are *221 unable to conclude that the patents were acquired by the company under the proposed contract if that is what the petitioners mean by the term "written contract." If the patents were exchanged by O'Connor for stock under an agreement, oral or otherwise, which provided that anyone other than O'Connor should be the owner of the 51,000 shares of stock, or any part thereof, the record fails to disclose it. The earliest arrangement between O'Connor and the Patent Company or anyone else respecting others becoming owners of part of the stock as disclosed by the record was in August 1948. O'Connor testified that about August 15, 1948, he approached the president and the secretary of the company about issuing to him and to others whom he designated certificates for shares of the company's stock. He stated that those officers gave him the company's stock book and told him to fill in certificates to the persons and for the number of shares he desired, that he filled in the certificates as he wished, and that on August 30, 1948, following the directors' meeting on that day, at which issuance of the company's stock was authorized, the president and secretary of the company signed the certificates *222 he had prepared. Those certificates were for a total of 50,900 shares. On September 25, 1948, at O'Connor's request, the company issued an additional certificate for 100 shares. While the record discloses that prior to the exchange of the patents on June 7, 1948, certain persons had loaned money to O'Connor which they expected him to repay, and shows that in August 1948 he caused certain shares of stock to be issued to them, it contains nothing from which we can find that prior to the exchange those persons had acquired any interest in the patents or in the stock to be issued in exchange for the patents. O'Connor was the sole owner of the patents prior to and at the time of their exchange on June 7, 1948, and on that day he became the sole owner of the 51,000 shares of stock the Patent Company was to issue for the patents as a result of the exchange. The foregoing situation distinguishes the instant case from Mojonnier & Sons, Inc., 12 T.C. 837; Fahs v. Florida Machine & Foundry Co., 168 Fed. (2d) 957, and similar cases relied on by petitioners. Prior to the exchanges involved in those cases the transferors had entered into arrangements under which others, *223 to whom stock was issued subsequent to the exchange, had acquired an interest in the subject matter of the transfers or had acquired an interest in the stock to be issued therefor. On the basis of such factual situations, it was held that immediately after the exchanges the transferors were not the owners of the stock issued to others and therefore did not own the amount of stock required by the statute to constitute them in control of the corporations. From statements made at the trial and on brief, it appears that petitioners are of the view that it is necessary that a stock certificate be actually issued in order to constitute a person the owner of stock in a corporation. Such issuance is not necessary. In Pacific National Bank v. Eaton, 141 U.S. 227, the Supreme Court said: "Millions of dollars of capital stock are held without any certificate; or if certificates are made out without their ever being delivered. A certificate is authentic evidence of title to stock; but it is not the stock itself, nor is it necessary to the existence of the stock. It certifies to a fact which exists independently of itself." There is no showing that when O'Connor became the *224 owner of the 51,000 shares of stock on June 7, 1948, he was under any obligation to make disposition of any portion of it to any one. He was entirely free to do as he wished with it. He could retain or dispose of all of it. Or he could retain part of it and dispose of part of it. Under these circumstances, O'Connor was in control of the Patent Company immediately after the exchange as contemplated by section 112(b)(5). The fact that more than 2 months after the exchange he caused 11,000 shares of his 51,000 shares to be issued to those designated by him in nowise affected the control which he had immediately after the exchange. This subsequent action could not obviate the application of section 112(b)(5) to the exchange. The Roberts Co., Inc., 5 T.C. 1. Accordingly we are of the opinion that the exchange was within the purview of section 112(b)(5) and that no gain or loss was recognizable to O'Connor on the exchange. Cf. Wilgard Realty Co., Inc., 43 B.T.A. 557, affd. 127 Fed. (2d) 514, certiorari denied 317 U.S. 655. The next question for determination relates to the basis to the Patent Company for purposes of depreciation *225 of the patents acquired from O'Connor on June 7, 1948. Pertinent portions of the Code are set out below. [2]
*226 Since under section 112(b)(5) no gain or loss was recognizable to O'Connor on the exchange of the patents for stock, the situation comes within the provisions of section 113(a)(8), and under the provisions of section 114(a), the basis of the patents to the Patent Company for depreciation purposes was the same as the adjusted cost to O'Connor. The parties have stipulated that the total adjusted cost of the patents to him on June 7, 1948, was $6,285.25. Accordingly we conclude that that is the proper amount to be used by the Patent Company as its basis for computing its depreciation allowances with respect to the patents. Having reached the foregoing conclusion it becomes unnecessary to determine the fair market value of the patents at the time of their transfer to the Patent Company on June 7, 1948. The next question involves the liability of the Patent Company for personal holding company surtax for its fiscal years ended July 31, 1950 through 1953. Pertinent provisions of the Code are set out below. [3] There is no dispute as to the ownership of the stock of the Patent Company during the years in question. Concededly O'Connor owned more than 50 percent in value of its stock *227 throughout all the years. The stock ownership requirement of section 501(a) is therefore met and the Patent Company must be deemed to be a personal holding company unless the record shows that less than the statutory percentage of its gross income in the respective years was personal holding company income. The required percentage would be at least 80 per cent for the year ended July 31, 1950, and in the event the Patent Company should be found to be a personal holding company for that year, the required percentage for the following 3 years would be 70 per cent. *228 The petitioners contend that less than the statutory percentage of the Patent Company's gross income for the years in question was personal holding company income for the reason that a stated portion of the total royalties received each year from Olsen and General Mills represented payment for engineering and other services rendered by O'Connor to the licensees. As authority for their contention, the petitioners cite U.S. Universal Joints Co., 46 B.T.A. 111. The respondent takes the position that the record does not support the contention of the petitioners. Respecting the circumstances under which he rendered services to the licensees of the Patent Company, O'Connor stated at the trial that he "impressed" his services upon them. In this connection the brief of petitioners, signed by O'Connor, contains the following in the statement of facts as to this issue: "The Gene Olsen Corporation and General Mills were patent licensees under contracts in J. Exhs. 22-V and 23-W, but these particular patent license contracts did not provide for the rendering of engineering services by John C. O'Connor or anyone else connected with The O'Connor Patent Company. Nevertheless it *229 was necessary for someone to help these licensees design and build the machines under the patents. The way it was done was that John C. O'Connor forced his services upon these companies and they accepted these services, but paid said O'Connor no money it being assumed that the royalties paid covered these services. * * * "The services above mentioned in brief * * * were performed by [O'Connor] an officer of The O'Connor Patent Company in efforts to increase and/or continue the income from the company's patent licensees. These services were not requested by the licensees, for no one connected with the licensees could have anticipated that they should be performed, or that the problems solved by John C. O'Connor could ever be solved. * * *" (Italics supplied.) The factual situation portrayed in the above statement of the petitioners is clearly unlike that in U.S. Universal Joints Co., supra. In that case the licensee, at the time it entered into a written licensing agreement, also entered into an oral agreement with the licensor to furnish it with engineering services which the parties anticipated would be and which were substantial. It was the intention of the parties *230 in entering into the written agreement that the amount designated therein as royalty was to be in part, payment for the right to manufacture and use the article covered by the agreement and in part, payment for the services to be rendered by the licensor. After there defining "a royalty as a payment or interest reserved by an owner in return for permission to use the property loaned and usually payable in proportion to use," we held that a portion of the payments received by the licensor from the licensee was compensation for services. From a consideration of the above-quoted statement of the petitioners in connection with the fact that neither of the license agreements involved here provided that the Patent Company should render any engineering or other services to the licensees, and with the further fact that the agreement with General Mills specifically recited that it contained the entire understanding and agreement between the parties, we think it is evident: (1) that the licensees did not desire that the Patent Company furnish them any services, (2) that there were no oral agreements or understandings between the Patent Company and the licensees that the Patent Company should *231 furnish them any services, and (3) that there were no agreements that a portion of the payments to be made by the licensees should constitute payment for services or for anything else except payment for the use of the patents or royalty. We fail to see how the licensees' acceptance of O'Connor's services, which admittedly he forced upon them, could change a portion of the royalty payments into compensation for services. While there is some evidence which indicates that the Patent Company accepted for payment certain bills submitted to it by O'Connor for services rendered to the licensees, such action of the Patent Company in agreeing to pay O'Connor for his services could in nowise change the character of the payments made by the licensees to the Patent Company. On the record before us we are of the opinion that no part of the payments received during the years in question by the Patent Company under its license agreements with Olsen and General Mills constituted payment for services, but that the entire amount of such payments was royalties. Since the royalties received by the Patent Company from the licensees during the respective years constituted more than 80 per cent of the *232 company's gross income for such years, the Patent Company was a personal holding company for each of the years within the meaning of section 501(a). The petitioners refer to Article I, Section 8, of the Constitution of the United States which authorizes Congress to secure for a limited time to inventors the exclusive rights to their inventions. They contend that by providing in section 502(a) of the Internal Revenue Code that royalties are personal holding company income and thereby making them subject to the personal holding company surtax imposed by section 500 of the Code and by providing that the surtax shall be in addition to the corporate normal tax otherwise provided in the Code, Congress has imposed a confiscatory tax on royalties, and in effect has canceled the benefits which the Constitution contemplated should be secured to inventors in their inventions. Accordingly the petitioners ask that we find that the holding company surtax provisions of the Code as applied to the Patent Company during the years in question are violative of Article I, Section 8, of the Constitution. In Lane-Wells Company, 43 B.T.A. 463, we held that the taxpayer, *233 more than 80 per cent of whose gross income was from royalties from patents, was a personal holding company and was liable for the personal holding company surtax imposed by the applicable revenue acts. That holding was affirmed by the Supreme Court in Commissioner v. Lane-Wells Company, 321 U.S. 219. Although the gross income, which was material to the holdings in that case, was from royalties, the question of the constitutionality of the imposition of the personal holding company surtax was not presented and was not considered by us or the Supreme Court. Morris Investment Corporation v. Commissioner, 134 Fed. (2d) 774, certiorari denied 320 U.S. 743, involved an appeal from our unpublished opinion in which we held that the taxpayer was a personal holding company and was liable for the personal holding company surtax determined by respondent. In the Circuit Court of Appeals the taxpayer contended that the personal holding company surtax imposed by section 351 of the applicable revenue act was void because it was an attempt by Congress in the guise of a tax to destroy personal holding companies and because the cumulative effect of undistributed *234 profits surtax and personal holding company surtax was confiscatory. In affirming our holding, the Circuit Court of Appeals said: "Any discussion as to the validity of this tax must take into account that the Sixteenth Amendment grants unrestricted power to the Congress to lay and collect taxes upon incomes and that the tax imposed by section 351 is upon income. Even if the motive of Congress had been to destroy personal holding companies, as the petitioner contends, the imposition of the surtax was well within the Congressional power to lay taxes upon incomes. * * *" After observing that the purpose of Congress in imposing personal holding company surtax was to increase the public revenues by making unprofitable the tax avoidance device of retention of income by the personal holding company, the court further said: "The Fifth Amendment is not violated by section 351 merely because that section imposes a tax more onerous in the case of personal holding corporations than other corporations. The *235 amendment does not require equal treatment in the imposition of taxes. Steward Machine Co. v. Davis, 1937, 301 U.S. 548, 584, 57 S. Ct. 883, 81 L. Ed. 1279, 109 A.L.R. 1293. Nor can we find that section 351 amounts to confiscation. Foley Securities Corp. v. Commissioner of Internal Revenue, 6[8] Cir., 1939, 106 Fed. (2d) 731, 736." Although it does not appear that the gross income of the Morris Investment Corporation upon which personal holding company surtax was imposed was from royalties from patents, the court has made clear the power of Congress to impose a surtax on the undistributed income of personal holding companies and that, although the cumulative effect of the surtax with another tax may be onerous, the surtax is not thereby made confiscatory. While it is true that the personal holding company surtax imposed on the Patent Company is imposed on the company's undistributed income from royalties from patents, the petitioners have not indicated, nor are we able to see, how that fact in anywise impairs any right which the above-mentioned portion of the Constitution authorized Congress to secure to inventors. Although by the personal holding company *236 provisions of the Code Congress intended to make it unprofitable for a personal holding company to retain and not distribute its income from royalties from patents, and although those provisions do make it unprofitable for the company to do so, such intent and effect neither impair the company's rights in its patents nor do they impinge on the security of those rights to the company. In view of what has been said above, we are unable to find, as petitioners contend, that the personal holding company provisions of the Code as applied to the Patent Company are violative of Article I, Section 8, of the Constitution. The petitioners contest the respondent's determinations of additions to tax in the case of the Patent Company because of its failure to file personal holding company returns, Forms 1120H, for each of the years in question. These additions to tax are proper under section 291(a) of the Code [4] unless such failure was due to reasonable cause and not due to willful neglect. The petitioners have submitted no evidence respecting the failure of the Patent Company to file a personal holding *237 company return for the years in question. However, on brief they contend in substance that the Patent Company was not a personal holding company for any of the years and that since its income tax returns, Forms 1120, showed net losses, no personal holding company returns were required. Under our holdings above the Patent Company was a personal holding company for each of the years in question and had a substantial *238 amount of income each year subject to the personal holding company surtax. In Safety Tube Corporation, 8 T.C. 757, affd. 168 Fed. (2d) 787, we said: "Advice of reputable counsel that a taxpayer was not liable for the tax has been held to constitute reasonable cause for failure to file a return on time when it was accompanied by other circumstances showing the taxpayer's good faith. Dayton Bronze Bearing Co. v. Gilligan, 281 Fed. 709; Adelaide Park Land, 25 B.T.A. 211; Agricultural Securities Corporation, 39 B.T.A. 1103; affirmed on another point, 116 Fed. (2d) 800; C. R. Lindback Foundation, 4 T.C. 652. Cf. Hugh Smith, Inc., 8 T.C. 660. * * *" In the Patent Company's income tax returns, Forms 1120, for each of the years in question, the answer "No" was given to the question whether the Patent Company was a personal holding company within the meaning of section 501 of the Internal Revenue Code. But we do not have here any showing that advice of counsel was sought, or relied on, by the Patent Company in formulating that answer or in determining *239 whether it should file personal holding company returns. The company's officers, without professional or expert assistance, resolved those matters in favor of the company. Under such circumstances, even though it be assumed that the company's officers were innocently mistaken as to the necessity for filing personal holding company returns, the failure of the company to file personal holding company returns is not shown to have been due to reasonable cause. Southeastern Finance Co., 4 T.C. 1069, affd. 153 Fed. (2d) 205; Cedarburg Canning Co. v. Commissioner, 149 Fed. (2d) 526. In the state of the record before us we have concluded, and found as a fact, that the Patent Company's failure to file personal holding company returns for the years in question was not due to reasonable cause. The respondent's action in determining the additions to tax is sustained. Because O'Connor took the position before the respondent that he transferred his patents to the Patent Company in an exchange on which gain or loss was recognizable, and in order to protect the revenue in the event O'Connor's position should be sustained, the respondent determined the *240 deficiency involved in O'Connor's case. Since we have held above that no gain or loss was recognizable on the exchange, we hold that O'Connor was not liable for the deficiency determined against him. Decisions will be entered under Rule 50. Footnotes
1. Fiscal year ended July 31.↩
1. SEC. 112. RECOGNITION OF GAIN OR LOSS. (a) General Rule. - Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section. (b) Exchanges Solely in Kind. - * * *
(5) Transfer to corporation controlled by transferor. - No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. * * *
(h) Definition of Control. - As used in this section the term "control" means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.↩
2. SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION. (a) Basis for Depreciation. - The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property. * * *
SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * *
(8) Property acquired by issuance of stock or as paid-in surplus. - If the property was acquired after December 31, 1920, by a corporation - (A) by the issuance of its stock or securities in connection with a transaction described in section 112(b)(5) * * * or (B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. * * *
(b) Adjusted basis. - The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a) adjusted as hereinafter provided. (1) General rule. - Proper adjustment in respect of the property shall in all cases be made - * * *
(B) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount - (i) allowed as deductions in computing net income under this chapter or prior income tax laws, and (ii) resulting (by reason of the deductions so allowed) in a reduction for any taxable year of the taxpayer's taxes under this chapter * * * or prior income, war-profits, or excess-profits tax laws, but not less than the amount allowable under this chapter or prior income tax laws. * * *↩
3. SEC. 500. SURTAX ON PERSONAL HOLDING COMPANIES. There shall be levied, collected, and paid, for each taxable year beginning after December 31, 1938, upon the undistributed subchapter A net income of every personal holding company (in addition to the taxes imposed by chapter 1) a surtax equal to the sum of the following: (1) 75 per centum of the amount thereof not in excess of $2,000: plus (2) 85 per centum of the amount thereof in excess of $2,000. SEC. 501. DEFINITION OF PERSONAL HOLDING COMPANY. (a) General Rule. - For the purposes of this subchapter and chapter 1, the term "personal holding company" means any corporation if - (1) Gross income requirement. - At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502; but if the corporation is a personal holding company with respect to any taxable year beginning after December 31, 1936, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum, until a taxable year during the whole of the last half of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 70 per centum of the gross income is personal holding company income; and (2) Stock ownership requirement. - At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals. * * *
SEC. 502. PERSONAL HOLDING COMPANY INCOME. For the purposes of this subchapter the term "personal holding company income" means the portion of the gross income which consists of: (a) * * * royalties * * *↩
4. SEC. 291. FAILURE TO FILE RETURN. (a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax * * *↩